Argued 3 December, decided 21 December, 1903; rehearing denied 8 February, 1904.

## KADDERLY *v.* PORTLAND.

[74 Pac. 710, 75 Pac. 222.]

CONSTITUTIONAL AMENDMENT—JUDICIAL OR POLITICAL QUESTION.

1. Courts of justice in the United States have a right to determine the validity of an amendment to a state constitution, without reference to the views or action of the political department; the question is distinctly judicial.

PROVISIONS FOR CONSTITUTIONAL AMENDMENT ARE MANDATORY.

2. The power of amendment contained in a State Constitution is a limited conferred power, its extent is measured by the terms in which it is granted, and the method thereby provided is strictly binding upon both people and legislature.

MEANING OF TERM "ADDITIONAL AMENDMENT."

3. The expression "additional amendment or amendments," occurring in Const. Or. Art. XVII, § 2, providing that no such amendment shall be proposed while another one is awaiting action, means any amendment to any part or clause of the constitution, so that no amendment can be brought forward while any one theretofore proposed is awaiting the action of a legislature or the people.

WHICH LEGISLATURE MUST PROVIDE FOR SUBMITTING AN AMENDMENT.

4. Under Const. Or. Art XVII, § 1, providing that a constitutional amendment agreed to by one legislature shall be referred to the next succeeding legislature, and that, if agreed to by it also, it shall be the duty of the legislative assembly to submit such amendment to the electors of the State, it devolves upon the legislature last adopting the amendment to submit it to a popular vote, otherwise it

will lapse. This requirement of submitting the amendment to a vote is mandatory upon the legislature that votes last, and if it is not complied with the amendment lapses upon adjournment, and thereafter is not awaiting the action of a legislative assembly.

PRESUMPTION AS TO VALIDITY OF STATUTES.

5. All intendments are in favor of the legality of statutes or constitutional amendments, and unless they are clearly in violation of some fundamental requirement they should be sustained.

ADOPTION OF INITIATIVE AND REFERENDUM AMENDMENT.

6. The amendment to Section 1 of Article IV of the Constitution of Oregon, known as the Initiative and Referendum Amendment, adopted in June, 1902, was legally proposed and adopted.

GUARANTY OF A REPUBLICAN FORM OF GOVERNMENT.

7. The initiative and referendum amendment of 1902 to the Constitution of Oregon does not conflict with the Constitution of the United States, Art. IV, § 4, guaranteeing to every State a republican form of government, since the representative feature of the present system still remains, the effect of the amendment being only to retain in the mass of the electors a larger share of legislative power than heretofore.

POWER OF LEGISLATURE OVER STATUTES INITIATED BY THE PEOPLE.

8. Statutes proposed and enacted by the people are subject to the same constitutional limitations as legislative statutes, and after their adoption they exist at the will of the legislature just as do other laws.

LIMITATION ON VETO POWER OF GOVERNOR.

9. The veto power of the Governor is not affected by the referendum amendment to Const. Or. Art. IV, § 1, except that he cannot veto measures referred by the legislature—all others he must still act on in the manner now provided.

EMERGENCY CLAUSE—LEGISLATIVE OR JUDICIAL QUESTION.

10. The question whether a given law is necessary for the immediate preservation of the public peace, health or safety, and thus one that may be put into operation at once by adding to it an emergency clause, is distinctly for the legislature, and its action in the matter is not judicially reviewable.

CONSTITUTIONAL LIMITATION ON MUNICIPAL POWER OF TAXATION.

11. The Portland charter of 1903, which provides that local improvements shall be paid for out of special funds created by assessing the property benefited, but does not make any provision to relieve the city from liability contingent on the failure of the funds, except to allow a reassessment, is not violative of Const. Or. Art. II, § 5, requiring acts incorporating cities to restrict their power of contracting debts, for there is some limitation, and any is enough.

CHARTER—CONSTRUCTION OF POWER OF REASSESSMENT.

12. Section 400 of the Portland charter of 1903, providing that, when an assessment for a local improvement is invalid, the council may make a new assessment on the lots benefited by the improvement to the extent of their respective and proportionate shares of the full value thereof, such reassessment to be based on the special and peculiar benefit of such improvement to the respective parcels assessed, at the time of the original assessment, and not to exceed the amount of the original assessment, does not authorize a reassessment without regard to benefits, contracts, or rights. True, there is a further provision that the council may adopt a different plan of apportionment of benefits, when, in its judgment, essential to secure an equitable assessment; but as a whole the section means that the reassessment must be proportionate to benefits.

RIGHT TO JUSTICE AND TO A REMEDY FOR INJURIES.

13. Section 401 of the Portland charter of 1903, which allows an appeal to the circuit court from the findings of the council on the objection of any property owner to a reassessment of the cost of a local improvement, but limits the jurisdiction of the circuit court to a determination of the amount of special benefits that ought equitably to be assessed against the property of the appellant, does not contravene Const. Or. Art. VII, § 9, giving the circuit courts appellate jurisdiction and supervisory control over all inferior officers and tribunals, for the right of appeal thus provided is not exclusive but is additional to other remedies that may be invoked.

CONSTITUTIONAL RIGHT OF APPEAL.

14. The right of appeal is wholly constitutional and statutory, and under the Constitution of Oregon the cases in which appeals may be taken, and the methods of precedure therein, are such only as the statutes may provide; but the "supervisory control" over inferior tribunals conferred by Const. Or. Art. VII, § 9, is exercised by other procedures besides appeal.

ASSESSMENTS FOR PUBLIC IMPROVEMENTS NOT TAXATION.

15. The assessing of property for the expense of a public improvement, in proportion to the benefit derived, is neither an assessing nor a taxing within the meaning of Const. Or. Art. IX, § 1, requiring an equal rate of assessment and taxation.

INJUNCTIONS AGAINST PASSING ORDINANCES.

16. Ordinarily courts of equity do not enjoin the enactment of municipal ordinances, or undertake to determine in advance of their passage whether they are proper or enforceable, if the council is acting within its powers. There are some exceptions to this rule, but none appear here, and the injunction was properly refused.

RETROSPECTIVE EFFECT OF CURATIVE STATUTE.

17. Section 400 of the Portland charter of 1903, which provides that whenever past or future assessments for local improvements have been or may be judicially declared void, the council may make a new assessment, although the proceedings of any body that made the original assessment may have been irregular or defective, and though such body may have ceased to exist, is retroactive in its operation, and authorizes reassessments in cases that arose under past charters as well as those that may arise under this charter.

CHANGING THEORY OF PROCEEDING ON APPEAL.

18. Where a suit was brought to enjoin a city from reassessing plaintiff's property for a street improvement, the fact that the contractors and the owners of the warrants issued on account of the improvement were made parties did not authorize plaintiff to change the theory of the suit to one by taxpayers to cancel illegal municipal warrants.

From Multnomah : JOHN B. CLELAND, ALFRED F. SEARS, JR., ARTHUR L. FRAZER, and MELVIN C. GEORGE, Judges, in joint session.

This is a suit by A. A. Kadderly and others against the City of Portland and others for an injunction.

The Constitution of this State (Art. XVII) provides :

"Section 1. Any amendment or amendments to this con-

stitution may be proposed in either branch of the legislative assembly, and if the same shall be agreed to by a majority of all the members elected to each of the two houses, such proposed amendment or amendments shall, with the yeas and nays thereon, be entered on their journals, and referred to the legislative assembly to be chosen at the next general election; and if, in the legislative assembly so next chosen, such proposed amendment or amendments shall be agreed to by a majority of all the members elected to each house, then it shall be the duty of the legislative assembly to submit such amendment or amendments to the electors of the State, and cause the same to be published without delay at least four consecutive weeks in several newspapers published in this State; and if a majority of said electors shall ratify the same, such amendment or amendments shall become a part of this constitution.

"Section 2. If two or more amendments shall be submitted in such manner that the electors shall vote for or against each of such amendments separately, and while an amendment or amendments which shall have been agreed upon by one legislative assembly shall be awaiting the action of a legislative assembly, or of the electors, no additional amendment or amendments shall be proposed."

Four constitutional amendments, known as the "Repealing Amendment," the "Municipality Indebtedness Amendment," the "Irrigation Amendment," and the "Judicial Amendment," were proposed in and agreed to by the legislative assembly of 1893: Laws 1893, pp. 874, 876, 877, 879. They were referred to the legislative assembly next chosen, and agreed to by it: Laws 1895, pp. 611, 612, 613. The latter assembly, however, failed to provide for the submission of any of the amendments to the electors of the State. Another amendment, providing for equal suffrage, was proposed in and agreed to by the legislative assembly of 1895: Laws 1895, p. 612. In 1897 there was no assembly of the legislature, because the members elected thereto failed to organize, and never met in legislative ses-

sion. The members of the legislative assembly chosen in 1898 met in regular session in January, 1899, agreed to the equal suffrage amendment which had been proposed in 1895 (Laws 1899, p. 1123), and passed an act submitting it and the four amendments previously agreed to by the legislative assemblies of 1893 and 1895 to the electors of the State (Laws 1899, p. 143), and they were all rejected by popular vote.

An amendment known as the "Initiative and Referendum Amendment" was duly proposed and agreed to by the legislative assemblies of 1899 and 1901 (Laws 1899, p. 1129; Laws 1901, p. 476), and an act passed by the latter assembly, submitting it to the electors at the June election in 1902 (Laws 1901, p. 4), when it was ratified by them. The amendment reads as follows:

"Section 1 of Article IV of the Constitution of the State of Oregon shall be, and hereby is, amended to read as follows:

"Section 1. The legislative authority of the State shall be vested in a legislative assembly, consisting of a Senate and House of Representatives, but the people reserve to themselves power to propose laws and amendments to the constitution and to enact or reject the same at the polls, independent of the legislative assembly, and also reserve power at their own option to approve or reject at the polls any act of the legislative assembly. The first power reserved by the people is the initiative, and not more than eight per cent of the legal voters shall be required to propose any measure by such petition, and every such petition shall include the full text of the measure so proposed. Initiative petitions shall be filed with the Secretary of State not less than four months before the election at which they are to be voted upon. The second power is the referendum, and it may be ordered (except as to laws necessary for the immediate preservation of the public peace, health, or safety), either by petition signed by five per cent of the legal voters, or by the legislative assembly, as other bills are enacted. Referendum petitions shall be filed with the

Secretary of State not more than ninety days after the final adjournment of the session of the legislative assembly which passed the bill on which the referendum is demanded. The veto power of the Governor shall not extend to measures referred to the people. All elections on measures referred to the people of the State shall be had at the biennial regular general elections, except when the legislative assembly shall order a special election. Any measure referred to the people shall take effect and become the law when it is approved by a majority of the votes cast thereon, and not otherwise. The style of all bills shall be : ' Be it enacted by the people of the State of Oregon.' This section shall not be construed to deprive any member of the legislative assembly of the right to introduce any measure. The whole number of votes cast for justice of the supreme court at the regular election last preceding the filing of any petition for the initiative or for the referendum shall be the basis on which the number of legal voters necessary to sign such petition shall. be counted. Petitions and orders for the initiative and for the referendum shall be filed with the Secretary of State, and in submitting the same to the people he, and all other officers, shall be guided by the general laws and the act submitting this amendment, until legislation shall be especially provided therefor."

After the adoption of this amendment, and in January, 1903, the legislature passed an act, approved January 23d (Sp. Laws 1903, p. 3), for the incorporation of the City of Portland, the emergency clause of which recites as follows :

"Sec. 427. Whereas there are several bridges upon important thoroughfares and car lines in the City of Portland, now old and in a dilapidated and ruinous condition, dangerous to life and property ; and whereas there is an immediate necessity for the construction of new bridges in the place of said old ones, in order to provide for the safety of the people of said city ; and whereas there are no ways or means by which, under the present charter of said city, new bridges can be constructed in place of the old ones ; and whereas the foregoing act provides ways and means available at once for the construction of new bridges;

and whereas there is otherwise a necessity for the imme-
diate adoption of the foregoing act to insure the health,
peace, and safety of the people of Portland, therefore, this
act shall take effect and be in force from and after its ap-
proval by the Governor."

Sections 400 and 401 of this charter are as follows:

"Sec. 400. Whenever an assessment for the opening,
altering, or grading of any street, or construction, recon-
struction, or repair of any sewer, or for any local improve-
ment which has been or may hereafter be made by the
city, has been or shall hereafter be set aside, annulled, de-
clared, or rendered void, or its enforcement refused by any
court of this State, or any federal court having jurisdiction
therein, whether directly or by virtue of any decision of
such court, or when the council shall be in doubt as to the
validity of such assessment, or any part thereof, the coun-
cil may, by ordinance, make a new assessment or reassess-
ment upon the lots, blocks, or parcels of land which have
been benefited by such improvement to the extent of their
respective and proportionate shares of the full value thereof.
Such reassessment shall be based upon the special and pe-
culiar benefit of such improvement to the respective parcels
of land assessed, at the time of its original making, but
shall not exceed the amount of such original assessment.
Interest thereon from the date of delinquency of the orig-
inal assessment may be added at the discretion of the
council. Such reassessment shall be made in an equitable
manner, as nearly as may be in accordance with the law
in force at the time it is made; but the council may adopt
a different plan of apportionment of benefits when, in its
judgment, essential to secure an equitable assessment.
The proceedings required by this charter to be had prior
to the making of the original assessment shall not be re-
quired to be taken or had within the intent of this section.
Such reassessment shall be made and shall become a charge
upon the property upon which the same is laid, notwith-
standing the omission, failure, or neglect of any officer,
body, or person to comply with the provisions of this char-
ter connected with or relating to such improvement and
assessment, and notwithstanding the proceedings of the

council, executive board, board of public works, or any officer, contractor, or other person connected with such work, may have been irregular or defective, whether such irregularity be jurisdictional or otherwise. Such reassessment shall not be made in case of a street improvement wherein a remonstrance sufficient in law to defeat the same shall have been filed.

" The council shall, by resolution, declare the district that will be benefited by the improvement for which the reassessment is made, and shall direct the auditor or city engineer to prepare a preliminary assessment upon the property included therein within a time to be fixed by said resolution. Upon the passage of such resolution the auditor shall, as soon thereafter as such reassessment is prepared, give notice by ten successive publications in the city official newspaper that such assessment is on file in his office, giving the date of the passage of the resolution directing the making of the same, and the time at which the council will hear and consider objections to said assessment by parties aggrieved thereby, and warning such persons not to depart until such reassessment has been completed. The auditor shall forthwith mail to the owner of each lot or part thereof, or tract of land affected by such assessment, or to his agent, if the post-office address of either be known to the auditor, a notice of such assessment; and if such post-office address be unknown, then such notice shall be directed to such owners or agent at Portland, Oregon. The owner or owners of any property which is assessed on such assessment, or any person having an interest therein, may, within ten days from the last publication herein provided, file with the auditor their objections in writing to such assessment. At the time appointed in such notice the council shall hear and determine all objections which have been filed by any party interested. The council shall have power to adjourn such hearing from time to time, and shall have the power, in its discretion, to revise and correct, or to set aside and order the remaking of such assessment, and shall pass an ordinance approving and confirming such reassessment as corrected and remade by it, and such decision shall be a final determination of the regularity, validity,

and correctness of the reassessment, except as herein
otherwise provided. When said reassessment is completed
and confirmed, it shall be entered in the docket of city
liens, and shall be enforced and collected in the same
manner that other assessments for local improvements are
enforced and collected under this charter and the laws
governing the city. All sums paid upon the former assess-
ment shall be credited to the property on account of which
the same were paid, as of the date of such payment; and
when it has been attempted to sell property for any assess-
ment, and such sale is found or declared void, upon the
making of the reassessment, the property shall be resold
and the proceeds of such sale shall be paid to the pur-
chaser at the former void sale or his assigns; but no pro-
ceedings shall be instituted for such reassessment unless
within ten years of the passage of the resolution of inten-
tion for the making of the original work, improvement or
repair.

"Sec. 401. Any person who has filed objections to such
new assessment or reassessment, which have not been
satisfied by the amendments made by the council, may
appeal to the Circuit Court of the State of Oregon for the
County of Multnomah from the assessment against any
property owned by him, or in which he has an interest. An
appeal shall be taken by serving notice of appeal within
twenty days from the passage of the ordinance adopting
the assessment as amended, upon the mayor, auditor, or
city attorney, and filing the same, with the proof of service,
together with an undertaking with one or more sureties,
who shall have the qualifications of sureties on appeal
from the circuit court to the supreme court, and, if ex-
cepted to, shall justify in like manner, conditioned that
such appellant will pay all costs and disbursements that
may be awarded against him on appeal, not exceeding
$500. Such bond and notice of appeal shall be filed within
twenty days from the service of such notice in the office
of the clerk of said circuit court, together with a copy of
the reassessment, so far as the same affects the property
of the appellant. Any number of persons may join in such
appeal, and the only question to be determined therein
shall be the amount of special benefits equitably to be

assessed against the property of each person joining in said appeal. The jury shall view the property assessed, and its verdict shall be a final and conclusive determination of the question. On such appeal the fact that one called as a juror is a taxpayer of the City of Portland shall not disqualify him from acting as such juror. The city shall be considered the plaintiff, and such appeal shall be conducted and be heard and determined, as far as practicable, in the same manner as an action at law."

On February 18, 1903, the city council adopted a resolution providing for the reassessment of benefits for the improvement of a portion of East Burnside Street previously made, the assessment having been adjudged invalid because of a failure to comply with the requirements of the charter in force at the time the improvement was made. The resolution established and defined the district specially benefited by the improvement, and directed the city auditor to prepare within 10 days a preliminary reassessment upon the lots, blocks, and parts of land within such district, to the extent of their proportionate shares of the full value of the improvement, and to give notice thereof to the owners of the property affected, in the manner provided by the charter; fixing April 1, 1903, as the time within which objections, if any, should be made to the preliminary reassessment. On March 31, 1903, this suit was commenced against the City of Portland, its common council, the contractors for the original improvement, their sureties, and J. W. Cook, who is alleged to be the owner and holder of city warrants issued on account of the improvement. The complaint sets out in detail the original proceedings for the improvement of the street, and the litigation in reference thereto, and alleges that the notice for the improvement on Burnside was not headed "Notice of Street Work," in letters one inch high, as required by the charter; that, notwithstanding such defect, the contract was let by the city to the defendants Smith & Howard ;

that the contract specified the kind and quality of the material to be used in the performance of the work; that neither the city, nor any officer thereof, should be liable for any part of the cost of the work; and that no money should be paid therefor out of the general fund, but the contractor was to look to the property affected by such improvement, and the owners thereof; that the contractors did not make any attempt to comply substantially with the contract, nor did the city engineer or his representatives endeavor to have them do so, but knowingly and fraudulently represented that the contract had been performed, by reason of which city warrants were issued, contrary to the terms of the contract, in violation of the law, and in fraud of the city, and especially of the plaintiffs.

It also alleges that the city auditor, in pursuance of the resolution adopted by the council in February, 1903, immediately filed a so-called reassessment, by copying the first attempted assessment, adding interest thereto; that he published a notice in the city official paper, containing the statement that objections would be heard by the council at its meeting to be held April 1, 1903, but he did not mail any notice to the owners of the property abutting on the street who had paid or bonded the former assessment; that the members of the council have agreed to adopt the reassessment for the improvement at a regular council meeting to be held on April 1, 1903, no matter what objections the property owners may have thereto, and will do so unless restrained by the court; that the proceedings of the council in reference to such reassessment will apparently be regular on their face, but in fact will be illegal and in violation of the constitution of this State and of the United States, *first*, because the charter under which the city was attempting to proceed at the time did not go into force and effect until 90 days after the adjournment of the legislature at which it was passed, because of the

initiative and referendum amendment adopted in 1902; and, *second*, if it did, sections 400 and 401 of the charter are unconstitutional and void, and not retrospective in their operation. Demurrers to the complaint by several parties defendant, because it did not state facts sufficient to constitute a cause of suit, were sustained by the court below, and plaintiffs appeal.                         AFFIRMED.

For appellants there was a brief and an oral argument by *Mr. Ralph R. Duniway.*

For respondents there was a brief and an oral argument by *Mr. Lawrence A. McNary,* City Attorney, and *Mr. John P. Kavanaugh.*

There were also briefs on the different constitutional and political questions involved by *Mr. George H. Williams, Mr. William P. Lord, Mr. John H. Mitchell, Mr. Julius C. Moreland, Mr. John B. Waldo, Mr. Joseph N. Teal, Mr. George E. Chamberlain, Mr. Charles E. S. Wood, Mr. Tilmon Ford, Mr. George C. Brownell,* and *Mr. William S. U'Ren, amici curiæ,* with an oral argument by *Mr. Ford* and *Mr. U'Ren.*

MR. JUSTICE BEAN, after stating the facts in the foregoing terms, delivered the opinion of the court.

The position of defendants is that the charter under which the city was acting at the time this suit was instituted was in force and effect, because (1) the initiative and referendum amendment of 1902 is not a part of the constitution; and (2) if it is, laws necessary for the immediate preservation of the public peace, health, or safety are by its express provisions excepted from its operation, and the decision of the legislature that the charter belonged to the excepted class is conclusive on the courts, and cannot be challenged by the plaintiffs. The argument in support of the first position is (1) that the initiative and referendum amendment was not regularly proposed in the legislature,

because at the time of its proposal other amendments to the constitution were awaiting the action of the legislative assembly and the electors; and (2) that it violates Section 4, Article IV, of the Constitution of the United States, guarantying to every State a republican form of government.

1. At the outset the defendants are met with the contention that the question as to whether an amendment to the constitution has been regularly proposed, adopted, and ratified is for the political department of the government, not for the courts, and, since the amendment in question was regularly agreed to by two successive legislatures, ratified by the electors, and recognized as valid by the legislative and executive departments, it must be so regarded by the courts. The right of a court to inquire into the validity of the adoption of an amendment to a state constitution, as all other questions in this case, has been ably and exhaustively considered, and discussed with consummate skill from every conceivable standpoint, not only by the attorneys for the immediate parties to the record, but by other counsel who have been permitted to appear and file briefs on account of the public importance of the issues involved, and to whom at this time we desire to acknowledge our indebtedness for their assistance. Aided materially by their briefs and arguments, we have carefully examined our right to inquire into the regularity of the adoption of the proposed amendment, and are clear that its validity is a judicial and not a political question. Indeed, no authority has been cited or has come under our observation holding to the contrary, except in cases where a separate tribunal has been created, and the exclusive power to canvass and declare the results of a vote on the adoption of the amendment and to make such amendment a part of the constitution is confided to such tribunal: *Miles* v. *Bradford, Governor,* 22 Md. 170 (85 Am. Dec. 643);

*Worman* v. *Hagan*, 78 Md. 152, 164 (27 Atl. 616, 21 L. R. A. 716); *Dennett, Petitioner*, 32 Me. 508 (54 Am. Dec. 602). In volume 6 of the American & English Encyclopedia of Law (2 ed.), at page 908, it is said : "The courts have full power to declare that an amendment to the constitution has not been properly adopted, even though it has been so declared by the political department of the State." For this statement of the law, the editors cite *Collier* v. *Frierson*, 24 Ala. 100; *Koehler* v. *Hill*, 60 Iowa, 543 (14 N. W. 738, 15 N. W. 609); *State* v. *McBride*, 4 Mo. 303, 305 (29 Am. Dec. 636); *State* v. *Timme*, 54 Wis. 318 (11 N. W. 785); *State* v. *Swift*, 69 Ind. 505; *State* v. *Young*, 29 Minn. 474 (9 N. W. 737); *Secombe* v. *Kittelson*, 29 Minn. 555 (12 N. W. 519); Jameson, Const. Conv. (4 ed.) 617; and each of these authorities fully supports the text.

The Alabama case was a suit on a treasurer's bond, the question involved being whether the constitution had been so amended as to extend the treasurer's official term. The court say : " We entertain no doubt that, to change the constitution in any other mode than by a convention, every requisition which is demanded by the instrument itself must be observed, and the omission of any one is fatal to the amendment. We scarcely deem any argument necessary to enforce this proposition. The constitution is the supreme and paramount law. * * The mode by which amendments are to be made under it is clearly defined. It has been said that certain acts are to be done, certain requisitions are to be observed, before a change can be effected. But to what purpose are these acts required, or these requisitions enjoined, if the legislature or any other department of the government can dispense with them ? To do so would be to violate the instrument which they are sworn to support, and every principle of public law and sound constitutional policy requires the courts to pronounce against every amendment which is shown not to

have been made in accordance with the rules prescribed by the fundamental law." In the Iowa case the controversy was based on the validity of an amendment to the constitution which had been ratified and approved by the people, and the appellant contended, as here, that the judicial department had no jurisdiction over political questions, and could not review the acts of the legislature or the people in the matter of the adoption of the amendment. Mr. Chief Justice DAY, however, in the course of a strong and clearly reasoned opinion, speaking for the majority of the court, says: "The authority opposed to the view advanced by appellant's counsel is most satisfactory and conclusive, and, so far as we have been able to discover, is without conflict. Not only must a constitution be amended in the manner prescribed in the existing constitution, but it is competent for the courts, when the amendment does not relate to their own powers or functions, to inquire whether, in the adoption of the amendment, the provisions of the existing constitution have been observed." And again: "While it is not competent for courts to inquire into the validity of the constitution and form of government under which they themselves exist, and from which they derive their powers, yet, when the existing constitution prescribes a method for its own amendment, an amendment thereto, to be valid, must be adopted in strict conformity to that method; and it is the duty of courts, in a proper case, when an amendment does not relate to their own powers or functions, to inquire whether, in the adoption of the amendment, the provisions of the existing constitution have been observed, and, if not, to declare the amendment invalid and of no effect." Mr. Jameson considers this to be the true rule governing such cases, and quotes the above citation with approval in his work on Constitutional Conventions, at page 617, fourth edition. Mr. Desty, in the note to *Miller* v. *Johnson*, 92 Ky. 589 (13

Ky. Law Rep. 933, 18 S. W. 522, 15 L. R. A. 524), expressly states that the question of the lawful adoption of an amendment to a constitution is a judicial one, while Mr. Chief Justice BEASLEY puts the pith of the whole matter in a single sentence, as follows : " When the inquiry is whether the legislature or any other body or officer has violated the regulations of the constitution, it is entirely plain that the decision of that subject must rest exclusively with the judicial department of the government": *State ex rel.* v. *Rogers*, 56 N. J. Law, 480 (28 Atl. 726, 29 Atl. 173).

One of the best considered cases we have seen on the subject is that of *State ex rel.* v. *Powell*, 77 Miss. 543 (48 L. R. A. 652, 27 South. 927), which involved the right of the court to inquire whether the amendment had received the majority prescribed by the constitution as essential to its valid adoption. The court held the question a judicial one ; Mr. Chief Justice WHITFIELD, in his usual clear and forcible manner, saying : " The true view is that the constitution, the organic law of the land, is paramount and supreme over Governor, legislature, and courts. When it prescribes the exact method in which an amendment shall be submitted, and defines positively the majority necessary to its adoption, these are constitutional directions, mandatory upon all departments of the government, and without strict compliance with which no amendment can be validly adopted. Whether an amendment has been validly submitted or validly adopted depends upon the fact of compliance or noncompliance with the constitutional directions as to how such amendments shall be submitted and adopted, and whether such compliance has in fact been had must, in the nature of the case, be a judicial question." Another well reasoned case is that of *State ex rel.* v. *Wurts*, 63 N. J. Law, 289 (45 L. R. A. 251, 43 Atl. 744), where the court hold that the question of the validity of a constitutional amendment is a judicial one, and say : " If a legislative

enactment, which may be repealed in a year, or an executive act, which affects only a single individual, cannot be allowed to stand if it contravenes the constitution, *a fortiori* a change in the fundamental law, which is much more permanent, and affects the whole community, should not be permitted to take place in violation of constitutional mandates." To the same effect, see *Trustees* v. *McIver*, 72 N. C. 76; *Prohibitory Amendment Cases*, 24 Kan. 700; *Livermore* v. *Waite*, 102 Cal. 113 (25 L. R. A. 312, 36 Pac. 424); *Edwards* v. *Lesueur*, 132 Mo. 410 (31 L. R. A. 815, 33 S. W. 1130); *State ex rel.* v. *Tooker*, 15 Mont. 8 (25 L. R. A. 560, 37 Pac. 840); *Nesbit* v. *People*, 19 Colo. 441 (36 Pac. 221); *State ex rel.* v. *Tufly*, 19 Nev. 391 (3 Am. St. Rep. 895, 12 Pac. 835).

The case of *Luther* v. *Borden*, 48 U. S. (7 How.) 1, which was relied upon by counsel in denial of the jurisdiction of the courts to inquire into the validity of a constitutional amendment, was that of two opposing governments, each claiming sovereignty. The point in issue was whether on the trial of an indictment or civil action it might lawfully be shown that the old Constitution of Rhode Island, under which the actual government of the State, including the courts, existed at the time of the trial, had been supplanted by a new constitution. Manifestly, a court could not inquire into the legality of the constitution to which it owed its own life and existence, for such an inquiry would be, as said by Mr. Chief Justice DAY in the Iowa case referred to, "like a man trying to prove his own personal existence." He "would be obliged to assume the very point in dispute before taking the first step in the argument." But, as remarked by DIXON, J., when referring to the Borden case : " The difference between a court's investigation into the legality of the government of which the court is a branch, and its investigation into the legality of a procedure, which in no way involves the legality of the government or of

itself, is too plain to require elucidation : *State ex rel.* v. *Wurts*, 63 N. J. Law, 289 (45 L. R. A. 251, 43 Atl. 744).

2. We pass, therefore, as we have a right and as it is our duty to do, to a consideration of the question as to whether the initiative and referendum amendment was legally adopted. The provisions of the constitution for its own amendment are mandatory, and must be strictly observed. A failure in this respect will be fatal to a proposed amendment, notwithstanding it may have been submitted to and ratified and approved by the people. The constitutional provisions are as binding upon the people as upon the legislative assembly, and the people cannot give legal effect to an amendment which was submitted in disregard of the limitations imposed by the constitution : see authorities already cited. Thus, the failure of the legislature to enter the proposed amendment in full on its journals, when required by the constitution (*Koehler* v. *Hill*, 60 Iowa, 543, 14 N. W. 738, 15 N. W. 609; *Oakland Pav. Co.* v. *Hilton*, 69 Cal. 479, 11 Pac. 3; *State ex rel.* v. *Tufly*, 19 Nev. 391, 3 Am. St. Rep. 895, 12 Pac. 835), or to cause it to be published the requisite length of time (*State ex rel.* v. *Tooker*, 15 Mont. 8, 25 L. R. A. 560, 37 Pac. 840), and other like omissions, have been held to invalidate the amendment, so that the subsequent approval of the people could not give it life or vitality. The constitution can be amended in but one of two ways—either by a constitutional convention properly convened, or according to the manner provided in the instrument itself. If the former mode is pursued, and the constitution framed by the convention is adopted by the people, it must be regarded as valid by the courts, because it supplants and takes the place of the old instrument, and becomes the only organic law. If, however, an attempt is made to amend an existing constitution, its every requirement regarding its own amendment must be substantially observed, and the omission of any one will

be fatal to the amendment. The constitution is the supreme law of the land, binding upon all, and can no more be disregarded in the manner of its own amendment than in any other respect. As long as it remains, its provisions must be observed. Nor is the legislative assembly, in proposing amendments, exercising strictly its legislative powers, but as said by the Supreme Court of California in *Livermore* v. *Waite*, 102 Cal. 113 (25 L. R. A. 312, 36 Pac. 424), it "is merely acting under a limited power conferred upon it by the people, and which might with equal propriety have been conferred upon either house, or upon the Governor, or upon a special commission, or any other body or tribunal. The extent of this power is limited to the object for which it is given, and is measured by the terms in which it has been conferred, and cannot be extended by the legislature to any other object, or enlarged beyond these terms": Jameson, Const. Conv. (4 ed.) § 551.

3. There is no question but that all the forms prescribed by the constitution were strictly and accurately observed in the proposal of the initiative and referendum amendment, and that it was properly submitted to the electors and ratified by them. The contention is that the legislature of 1899 had no authority to propose it, because other amendments were awaiting the action of the legislative assembly and the people. This inquiry necessarily calls for a construction of sections 1 and 2, article XVII, of the constitution, and a decision as to whether the proceedings looking to the amendment were in compliance therewith. The equal suffrage amendment may be eliminated from the discussion. It was proposed in 1895, when all concede that four other amendments agreed to by the legislative assembly of 1893 were pending. Its proposal, therefore, was clearly without authority, if the position is sound that the latter clause of section 2 of article XVII, which declares that "while an amendment or amendments which shall have

been agreed upon by one legislative assembly shall be awaiting the action of a legislative assembly, or of the electors, no additional amendment or amendments shall be proposed," prohibits the proposing of an amendment to the constitution while an amendment of other or different portions of that instrument is pending. If, on the other hand, the provision quoted is to be considered as applying only to an amendment on the same subject or article as that previously proposed, the objections to the initiative and referendum amendment at once disappear.

The true meaning of section 2 is not clear. The amendments prohibited by the section are "additional amendment or amendments." The meaning of the word "additional" is, "given with or joined to some other," and embraces the idea of joining or uniting one thing to another so as to form an aggregate: Anderson's Law Dict.; *State* v. *Hull*, 53 Miss. 626, 645; *Brooks* v. *Whitmore*, 139 Mass. 356 (31 N. E. 731). If the word is used in this sense, it simply means that while one amendment is pending no other relating to the same section or subject-matter shall be proposed, but does not prohibit the proposing of amendments to other parts of the constitution. If, on the contrary, the phrase "amendment or amendments" has the same significance it bears in other parts of the same section and article, the prohibition is against amendments of any character. The frequent use of these words, and their particular relation to the subject-matter in which they are always employed, lead to the conviction that the meaning of the constitution is that, while an amendment or amendments agreed to by one legislative assembly shall be awaiting the action of a legislative assembly or the electors, no additional amendment or amendments shall be proposed to any part or clause of the constitution. The object is to prevent the people from being called to vote upon proposed amendments to the constitution except at

considerable intervals. In this view we have the authority of the Honorable MATTHEW P. DEADY, a jurist of distinguished ability, who was the president and an influential member of the constitutional convention. In his marginal notes to the constitution, as published in his compilation of the General Laws of Oregon of 1864 (page 123), he uses the following language : "While an amendment pending, no other to be proposed "; indicating his interpretation of the section.

4. The question then, is, were the amendments proposed by the legislative assemblies of 1893 and 1895 awaiting the action of a legislative assembly or the electors in 1899, when the initiative and referendum amendment was proposed? If so, the latter is invalid because the legislature did not have power to propose it. If, however, the previous amendments had lapsed because of the failure of the legislature of 1895 to submit them to the people, the initiative and referendum amendment was legally proposed, and is valid. Section 1, article XVII, of the constitution, provides that any amendment or amendments to the constitution may be proposed in either branch of the legislative assembly, and, if agreed to by a majority of both houses, such proposed amendment or amendments shall, with the yeas and nays thereon, be entered in their journals, and be referred to the legislative assembly "to be chosen at the next general election," and if, in the legislative assembly "so next chosen," such proposed amendment or amendments shall be agreed to by a majority of all the persons elected to each house, "then it shall be the duty of the legislative assembly to submit such amendment or amendments to the electors of the State, and cause the same to be published without delay at least four consecutive weeks in several newspapers published in this State." The contention is that under this section it was not necessarily the duty of the legislative assembly of 1895 to submit to the

electors the amendments agreed to by the previous legislative assemblies, but that they might be legally submitted by any subsequent legislature, and until so submitted no other amendments could be proposed. In other words, the position is that, after two successive legislatures agree to an amendment or amendments, the right to propose other amendments can be forever denied, simply by failing or neglecting to submit those already agreed upon to the people. This does not seem to us to be a reasonable interpretation of the constitution. A legislature, in proposing and agreeing to amendments and submitting them to the people, is acting under a limited authority, and its powers must be strictly construed. It may propose and submit amendments in the manner provided by the constitution, and in no other way. In doing so, it does not exercise ordinary legislative powers, but rather acts as the agent of the people in the discharge of a ministerial duty, deriving its authority alone from the provisions of the constitution regulating its own amendment. It must comply strictly with all the requirements thereof, and, when the constitution provides that an amendment, after being adopted by the second legislative assembly, shall then be submitted to the electors and published without delay, it seems to us to mean that it must be done by the legislative assembly last adopting it. The legislature may, and does in some instances while acting in its ordinary capacity, possess large discretionary powers, and the failure or neglect of one session to perform a duty imposed upon it would not prevent another session from discharging it. When, however, the legislature is acting as the mere agent of the people, in the performance of certain defined and prescribed duties enumerated in the constitution, it cannot exercise its powers beyond the letter of its authority, and must act within the limits of that which is delegated.

Now, the provision is that, if an amendment proposed

and agreed to by one legislative assembly shall be agreed to by the one next chosen, it is the duty of the legislative assembly to submit it to the electors and cause it to be published without delay. The natural conclusion from this language is that it was intended that the assembly next chosen and agreeing to the amendment a second time should be the one to perform this duty. Article XVII, § 1, intends to give, and does give, all the power over a proposed amendment and its submission to the people to the legislature first proposing and agreeing to the amendment and the legislature chosen at the next general election. It mentions two legislative assemblies, and only two, assigning them certain powers and duties, as though they were one organization. It nowhere refers to or recognizes the rights of any other legislative assembly in connection with the amendment. The intent is that the several steps required in proposing and adopting amendments shall follow each other in natural sequence and without delay. As the second section of article XVII is designed to prevent the continual agitation of the question of amending the constitution, and to restrict the power of the legislature to propose amendments within certain periods if others are pending, so the first section is intended to secure dispatch in the adoption of a proposed amendment by the two legislative assemblies, and its ratification or rejection by the people while the matter shall be fresh in the minds of all concerned. Were it otherwise, the right to propose and act upon succeeding amendments to the constitution could be successfully tied up for an indefinite period, or until an aroused public sentiment should compel some legislative assembly to submit them to the people in order to clear the way for others that might be desired.

But it is said that the language of article XVII, § 1, providing for the submission of a proposed amendment to the electors after it has been agreed to by two successive legis-

lative assemblies, is not mandatory, and since it does not make it the exclusive duty of the second legislature agreeing to the amendment to submit it to the electors, it may be submitted by any subsequent legislative assembly. Methods of procedure prescribed by a constitution are ordinarily regarded as mandatory, and, as said by Mr. Cooley, "the courts tread upon very dangerous ground when they venture to apply the rules which distinguish directory and mandatory statutes to the provisions of the constitution. Constitutions do not usually undertake to prescribe mere rules of proceeding, except when such rules are looked upon as essential to the thing to be done; and they must then be regarded in the light of limitations upon the power to be exercised. It is the province of an instrument of this solemn and permanent character to establish those fundamental maxims and fix those unvarying rules by which all departments of the government must at all times shape their conduct; and, if it descends to prescribing mere rules of order in unessential matters, it is lowering the proper dignity of such an instrument, and usurping the proper province of ordinary legislation. We are not, therefore, to expect to find in a constitution provisions which the people, in adopting it, have not regarded as of high importance, and worthy to be embraced·in an instrument which, for a time at least, is to control alike the government and the governed, and to form a standard by which is to be measured the power which can be exercised as well by the delegate as by the sovereign people themselves. If directions are given respecting the times or modes of proceeding in· which a power should be exercised, there is at least a strong presumption that the people designed it should be exercised in that time and mode only; and we impute to the people a want of due appreciation of the purpose and proper province of such an instrument, when we infer that such directions are given to

any other end.  Especially when, as has been already said, it is but fair to presume that the people, in their constitution, have expressed themselves in careful and measured terms, corresponding with the immense importance of the powers delegated, and with a view to leave as little as possible to implication": Cooley, Const. Lim. (7 ed.) 114. And at another place the learned author and jurist says : "The fact is this that whatever constitutional provision can be looked upon as directory merely is very likely to be treated by the legislature as if it was devoid even of moral obligation, and to be therefore habitually disregarded.  To say that a provision is directory seems, with many persons, to be equivalent to saying that it is not law at all.  That this ought not to be so must be conceded. That it is so we have abundant reason and good authority for saying.  If, therefore, a constitutional provision is to be enforced at all, it must be treated as mandatory": Cooley, Const. Lim. (7 ed.) 214.  So it was said by Mr. Justice EMOTT in *People* v. *Lawrence*, 36 Barb. 177, 186 : " It will be found, upon full consideration, to be difficult to treat any constitutional provision as merely directory, and not imperative."

These rules are especially applicable to our constitution, which deals alone with those fundamental principles of government essential to a constitution, and does not invade the province of ordinary legislation.  It is but right and proper, therefore, that the procedure provided for so important a matter as its own amendment shall be regarded as mandatory, and a limitation upon the exercise of the power.  We are accordingly of the opinion that when an amendment to the constitution shall be agreed to by two legislative assemblies, it must be submitted to the electors by the one last agreeing to it, and a failure in this regard will be fatal. to the amendment.  It is true that a mere grammatical construction, based on the meaning and office

of the words "then" and "the," as used in the section under consideration, might, perhaps, justify the opinion that it is not made the imperative duty of the second legislative assembly approving a constitutional amendment to submit it to the electors. But such a technical construction would be contrary to the spirit and evident intent of the constitution, and might result in preventing needed and wholesome amendments. The section under consideration was taken from the Constitution of Indiana, and was construed in *In re Denny*, 156 Ind. 104 (51 L. R. A. 722, 59 N. E. 359), in accordance with the views here expressed. The question involved here, it is true, was not directly in issue there, but the opinion of the learned court is entitled to great weight and consideration, and is in harmony with the true intent and meaning of the constitution.

5. But if it be conceded that these views are not free from doubt, that of itself would be a sufficient reason for sustaining the amendment. It cannot be supposed that in the consideration of this question a court should be governed by any less strict rules than it would be required to follow in passing upon the constitutionality of a statute, and it has been the settled rule, ever since the opinion of Mr. Chief Justice MARSHALL in *Fletcher* v. *Peck*, 10 U. S. (6 Cranch) 87, that "it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered as void. The opposition between the constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other." The courts will never declare a legislative act or proceeding void when a substantial doubt exists in the judicial mind. A proper respect for a coördinate branch of the government demands that all intendments in favor of the regularity of its proceedings shall be invoked, and,

unless its violation of the constitution is clear and palpable, its act will be sustained. This rule has been often announced in the strongest language, varied only to give force of expression. It has been repeatedly recognized and observed by this court (*Cline* v. *Greenwood*, 10 Or. 230; *Cook* v. *Port of Portland*, 20 Or. 580, 27 Pac. 263, 13 L. R. A. 533; *Simon* v. *Northup*, 27 Or. 487, 40 Pac. 560, 30 L. R. A. 171), the latest utterance being that of Mr. Justice MOORE in *Ellis* v. *Frazier*, 38 Or. 462 (63 Pac. 642, 53 L. R. A. 454), wherein he says the rule is "well settled in this State that an act of the legislative assembly will not be declared void, in whole or in part, unless its incompatibility with the organic law is apparent and free from doubt, every reasonable intendment being invoked to uphold the validity of the statute."

6. We conclude, therefore, that the amendments proposed and adopted by the legislative assemblies of 1893 and 1895 were not awaiting the action of the legislative assembly or the electors in 1899, within the meaning of Const. Or. Art. XVII, § 2, at the time the initiative and referendum amendment was proposed; and, as a consequence, the latter was legally proposed, and is now a part of the constitution.

7. Nor do we think the amendment void because in conflict with the Constitution of the United States, Article IV, § 4, guarantying to every State a republican form of government. The purpose of this provision of the constitution is to protect the people of the several States against aristocratic and monarchical invasions, and against insurrections and domestic violence, and to prevent them from abolishing a republican form of government: Cooley, Const. Lim. (7 ed.) 45; 2 Story, Const. (5 ed.) § 1815. But it does not forbid them from amending or changing their constitution in any way they may see fit, so long as none of these results is accomplished. No particular style

of government is designated in the constitution as republican, nor is its exact form in any way prescribed. A republican form of government is a government administered by representatives chosen or appointed by the people or by their authority. Mr. Madison says it is "a government which derives all its powers directly or indirectly from the great body of the people, and is administered by persons holding their offices during pleasure, for a limited period, or during good behavior": The Federalist, 302. And in discussing the section of the Constitution of the United States now under consideration, he says : " But the authority extends no further than to a guaranty of a republican form of government, which supposes a preëxisting government of the form which is to be guarantied. As long, therefore, as the existing republican forms are continued by the States, they are guarantied by the federal constitution. Whenever the States may choose to substitute other republican forms, they have a right to do so, and to claim the federal guaranty for the latter. The only restriction imposed on them is that they shall not exchange republican for anti-republican constitutions ": The Federalist, 342. Now, the initiative and referendum amendment does not abolish or destroy the republican form of government, or substitute another in its place. The representative character of the government still remains. The people have simply reserved to themselves a larger share of legislative power, but they have not overthrown the republican form of the government, or substituted another in its place. The government is still divided into the legislative, executive, and judicial departments, the duties of which are discharged by representatives selected by the people.

8. Under this amendment, it is true, the people may exercise a legislative power, and may, in effect, veto or defeat bills passed and approved by the legislature and the

44 OR.——10

Governor; but the legislative and executive departments
are not destroyed, nor are their powers or authority mate-
rially curtailed. Laws proposed and enacted by the people
under the initiative clause of the amendment are subject
to the same constitutional limitations as other statutes, and
may be amended or repealed by the legislature at will.

9. The veto power of the Governor is not abridged in any
way, except as to such laws as the legislature may refer to
the people. The provision of the amendment that "the
veto power of the Governor shall not extend to measures
referred to the people" must necessarily be confined to the
measures which the legislature may refer, and cannot apply
to acts upon which the referendum may be invoked by
petition. The Governor is required, under the constitution,
to exercise his veto power, if at all, within five days after
the act shall have been presented to him, unless the gen-
eral adjournment of the legislature shall prevent its return
within that time, in which case he shall exercise his right
within five days after the adjournment. He must necessa-
rily act, therefore, before the time expires within which a
referendum by petition on any act of the legislature may
be invoked, and before it can be known whether it will be
invoked or not. Unless, therefore, he has a right to veto
any act submitted to him, except such as the legislature
may specially refer to the people, one of the safeguards
against hasty or ill-advised legislation which is everywhere
regarded as essential is removed—a result manifestly not
contemplated by the amendment.

10. This brings us to the question as to whether the leg-
islative declaration that the Portland charter was necessary
for the preservation of the public peace, health, and safety
is conclusive on the courts. Under the initiative and refer-
endum amendment, laws "necessary for the immediate
preservation of the public peace, health, or safety" are ex-
cepted from its operation. As to them, the action of the

legislative and executive departments is conclusive and final, so far as their enactment is concerned. No power is reserved to the people to approve or disapprove them. They are not subject to the referendum amendment, and as to them the powers of the other departments of the government derived from the constitution are unaffected. The legislative assembly may, in its discretion, put them into operation through an emergency clause, as provided in the Constitution of Oregon, Article IV, § 28, or it may allow them to become laws without an emergency clause, the necessity or expediency of either course being a matter for its exclusive determination. As to all other laws the amendment applies, and they cannot be made to go into operation for 90 days after the adjournment of the session at which they were adopted, or until after approval by the people if the referendum is invoked. The Constitution of Oregon, Article IV, § 28, giving the legislative assembly power to put any law into force upon approval by declaring an emergency, has been modified by the amendment of 1902, so as to exclude from the power to declare an emergency all laws except those necessary for the immediate preservation of the public peace, health, or safety. So far, all are agreed. But the vital question is, what tribunal is to determine whether a law does or does not fall under this classification? Are the judgment and findings of the legislative assembly conclusive, or are they subject to review by the courts? The inquiry is much simplified by bearing in mind that the exception in the constitutional amendment is not confined to such laws as the legislative assembly may legally enact by virtue of the police powers of the State, or to those alone that may affect the public peace, health, or safety. The police power is limited to the imposition of restraints and burdens on persons and property, in order to secure the general comfort, health, and prosperity of the State: Tiedeman, Lim. Pol. Power, § 1.

But the language of the constitutional amendment is broader, and includes all laws, of whatsoever kind, necessary for the immediate preservation of the public peace, health, or safety, whether they impose restraints on persons and property, or come strictly within the police powers, or not. The laws excepted from the operation of the amendment do not depend alone upon their character, but upon the necessity for their enactment in order to accomplish certain purposes. As to such laws, the amendment of 1902 does not in any way abridge or restrict the power of the legislature, which, by the insertion of a proper emergency clause, may unquestionably cause them to go into effect upon approval by the Governor. As the legislature may exercise this power when a measure is in fact necessary for the purposes stated, and as the amendment does not declare what shall be deemed laws of the character indicated, who is to decide whether a specific act may or may not be necessary for the purpose? Most unquestionably, those who make the laws are required, in the process of their enactment, to pass upon all questions of expediency and necessity connected therewith, and must therefore determine whether a given law is necessary for the preservation of the public peace, health, and safety.

It has always been the rule, and is now everywhere understood, that the judgment of the legislative and executive departments as to the wisdom, expediency, or necessity of any given law is conclusive on the courts, and cannot be reviewed or called in question by them. It is the duty of the courts, after a law has been enacted, to determine in a proper proceeding whether it conflicts with the fundamental law, and to construe and interpret it so as to ascertain the rights of the parties litigant. The powers of the courts do not extend to the mere question of expediency or necessity, but, as said by Mr. Justice BREWER, "they are wrought out and fought out in the legislature

and before the people. Here the single question is one of power. We make no laws. We change no constitutions. We inaugurate no policy. When the legislature enacts a law, the only question which we can decide is whether the limitations of the constitution have been infringed upon ": Prohibitory Am. Cas. 24 Kan. 700, 706. The amendment excepts such laws as may be necessary for a certain purpose. The existence of such necessity is therefore a question of fact, and the authority to determine such fact must rest somewhere. The constitution does not confer it upon any tribunal. It must therefore necessarily reside with that department of the government which is called upon to exercise the power. It is a question of which the legislature alone must be the judge, and when it decides the fact to exist, its action is final: *Biggs* v. *McBride*, 17 Or. 640 (21 Pac. 878, 5 L. R. A. 115); *Umatilla Irrig. Co.* v. *Barnhart*, 22 Or. 389 (30 Pac. 37); *Gentile* v. *State*, 29 Ind. 409 ; *Wheeler* v. *Chubbuck*, 16 Ill. 361 ; Sutherland, Stat. Const. 108. In this view we are supported by the Supreme Court of South Dakota. In 1898 an amendment to the constitution of that State was adopted by the people, similar in many respects to the amendment now under consideration ; and, so far as the laws exempted from its operation are concerned, the language of the two amendments is identical. In *State ex rel.* v. *Bacon*, 14 S. D. 394, 404 (85 N. W. 225), the court say in referring to this amendment: "It will be observed that the law of 1901 which we are considering not only declares that an emergency exists, but also that the 'provision is necessary for the immediate preservation and support of the existing public institutions of this State.' It seems to have been uniformly held under constitutions containing an emergency clause, and providing that laws containing such a clause shall take effect as therein directed, that the action of the legislature in inserting such a clause is conclusive upon the courts

[citing authorities]. No reason occurs to us why the same rule should not apply to the act in question. The legislature having declared that the provisions of that act are necessary for the immediate preservation and support of the existing public institutions of the State, that declaration is conclusive upon this court, and brings this class clearly within the exception contained in section 1 [as amended] of article 3 of the constitution."

But, it is argued, what remedy will the people have if the legislature, either intentionally or through mistake, declares falsely or erroneously that a given law is necessary for the purposes stated ? The obvious answer is that the power has been vested in that body, and its decision can no more be questioned or reviewed than the decision of the highest court in a case over which it has jurisdiction. Nor should it be supposed that the legislature will disregard its duty, or fail to observe the mandates of the constitution. The courts have no more right to distrust the legislature than it has to distrust the courts. The constitution has wisely divided the government into three separate and distinct departments, and has provided that no person charged with official duties under one of these departments shall exercise any of the functions of another, except as in the constitution expressly provided : Const. Or. Art. III, § 1. It is true that power of any kind may be abused when in unworthy hands. That, however, would not be a sufficient reason for one coördinate branch of the government to assign for attempting to limit the power and authority of another department. If either of the departments, in the exercise of the powers vested in it, should exercise them erroneously or wrongfully, the remedy is with the people, and must be found, as said by Mr. Justice STRAHAN in *Biggs* v. *McBride*, 17 Or. 640 (5 L. R. A. 115, 21 Pac. 878), in the ballot box. We are of the opinion, therefore, that the findings and declarations of the legis-

lature that the act of 1903 for the incorporation of the City of Portland was necessary for the immediate preservation of the public peace, health, and safety are conclusive on the courts, and consequently the charter was not subject to the referendum power, and was in force and effect from and after its approval.

This disposes of the most important questions in the case. The result is, *first*, that the initiative and referendum amendment was legally proposed and adopted ; *second*, that it is not in conflict with the provisions of the Constitution of the United States guarantying to every State a republican form of government; and, *third*, that the question whether a law is necessary for the immediate preservation of the public peace, health, or safety, and consequently excepted from the operations of the amendment, is a legislative and not a judicial question.

The remaining issues involved relate to objections made to the validity of the city charter and to certain proceedings had thereunder. We have examined these questions with care, and fully concur in the views of the trial court. The opinion of JUDGE CLELAND thereon—an able and clear exposition of the law—follows :

"It is alleged in the complaint that the particular sections of the charter of 1903 which provide for reassessment are unconstitutional and void, as being in conflict with some eleven different sections of the Constitution of the State of Oregon and the Fourteenth Amendment of the Constitution of the United States. However, upon his argument and his briefs filed herein, the counsel for plaintiffs has urged but one reason why the charter, as a whole, is unconstitutional. His arguments as to the unconstitutionality of the charter, and of sections 400 and 401 thereof, which prescribe the manner of making a reassessment, may be grouped under four heads :

11. "*First.* It is contended that the entire charter of

1903 is unconstitutional and void, because it does not limit the power of the council in contracting debts.   Article XI, § 5, of the Constitution of Oregon, is as follows : 'Acts of legislative assembly incorporating towns and cities shall restrict their powers of taxation, borrowing money, contracting debts and loaning their credit.'

" Section 114 of the charter limits the council as to its taxing powers.   Section 73, subd. 24, places a limit upon the issuance of bonds.   Section 117 limits the council in the matter of expenditures and in the creation of debts as follows :

'The council shall not authorize any expenditure during any fiscal year, nor shall any liability or liabilities be incurred by or on account of the City of Portland, to be paid in any particular fiscal year (for the payment of which the approval of the council shall be necessary), which singly or in the aggregate shall be in excess of the revenues received during such year applicable, or made applicable by transfer, to the payment of such liability or liabilities ; and nothing contained in this charter shall authorize the enforcement against or collection from said city, on account of any debt, contract, or liability, of any sum in excess of the limitations prescribed in this section.   The city shall issue no warrants or other evidences of indebtedness, except under special assessment funds, unless there is money in the treasury duly appropriated and applicable to the payment of the same on presentation, and all evidences of indebtedness issued contrary to this provision shall be null and void.'

" This section would appear to restrict effectually the powers of the city council as required by the section of the constitution referred to ; but it is insisted by council for plaintiffs that these restrictions do not apply to warrants issued for street and sewer improvements payable out of special funds created by assessments on the property benefited, on the ground that there might be, in fact, no actual benefit to the property assessed, or that the counsel

might arbitrarily declare, after assessing the property, that there was no benefit, and in such an event the warrants would be an indebtedness against the city, and that, since the issuance of such warrants for street or sewer improvements is not limited, the charter is unconstitutional. It is a well-settled rule that contracts for street or sewer improvements which provide for payment out of funds to be raised by assessment of the property improved do not create an indebtedness, within the meaning of the constitution, or within the meaning of charter provisions limiting the amount of a city's indebtedness. A contract which provides that the cost of any improvement shall be paid out of the fund expressly provided therefor is valid, although the limit of the indebtedness has been reached : *Little* v. *City of Portland,* 26 Or. 235 (37 Pac. 911). Section 400 of the charter makes it the duty of the council, in case an assessment is declared invalid for any reason, to make a reassessment, and prescribes a method of so doing ; but, whether a reassessment is made or not, the mere fact that by some accident or wrongful act of the council the fund provided for any warrants issued for street or sewer improvements might fail would not make the charter invalid, as violating the Constitution of Oregon, Article XI, § 5. Where there has been an attempt at restriction, the legislature having the discretion, the courts cannot intervene to control it, and to direct what restriction shall be sufficient : *Lent* v. *Portland,* 42 Or. 488 (71 Pac. 645). In this charter there is certainly an attempt on the part of the legislature to restrict the debt-creating power of the council in the matter of street and sewer improvements, by providing that they shall be paid only out of special funds created at the time the improvement is made ; and the fact that by some accident or by some wrongful act upon the part of the city council the city might ultimately be liable for the payment of some of these warrants would not justify the

court in saying that there was no restriction whatever. In fact, it is doubtful, under the authorities, whether any restrictive clause could be provided which would relieve the city in all cases from contingent liabilities.

12. "*Second.* It is strenuously contended by counsel for plaintiffs that section 400 of the charter of 1903 is unconstitutional and in violation of several sections of the Constitution of the State of Oregon and of the Fourteenth Amendment to the Constitution of the United States, in that it is an attempt to authorize the City of Portland and its officers to deprive persons of their property without due process of law, take the private property of one person and give it to another person, take private property for public use without just compensation, etc. But the plaintiffs' whole argument, simmered down, comes to this: that said section gives the council power 'to levy reassessments as they deem equitable without regard to benefits, contracts, rights, or anything else.' It is conceded by plaintiffs that reassessment after the original assessment has been declared void may be valid, and that provisions therefor in city charters may be entirely constitutional; and it is conceded that this section in question would be constitutional and just, but for the fact that it contains the following sentence, to wit: 'But the council may adopt a different plan of apportionment of benefits when, in its judgment, essential to secure an equitable assessment.' This is the sentence that gives [the] council power to levy reassessments without regard to 'benefits, contracts, rights, or anything else.' But, in the opinion of the court, the sentence above quoted, when read with the remainder of the section, is susceptible of no such construction. In the same section it is provided:

'The council may, by ordinance, make a new assessment or reassessment upon the lots, block, or parcels of land which have been benefited by such improvement to the

extent of their respective and proportionate shares of the full value thereof. Such reassessment shall be based upon the special and peculiar benefit of such improvement to the respective parcels of land assessed, at the time of its original making, but shall not exceed the amount of such original assessment.'

"It will be seen from the above quotation that the council is limited in making such reassessment to the lots, blocks, or parcels of land which have been benefited, and to the amount of the special and peculiar benefit of such improvement to each of such parcels of land. The following provision, that the council may adopt a different plan of apportion ment of benefits, when read in connection with these parts of the section above quoted, clearly refers to the plan such of apportionment of the special and peculiar benefit of improvement to each parcel of land. It could not be construed to authorize the council to assess or apportion any amount of the cost of improvement to any piece of land in excess of the amount of the benefit to such land without wholly disregarding the other parts of the section above quoted. In fact, the very words of the sentence objected to by plaintiffs, 'apportionment of benefits,' show that, whatever plan may be adopted by the council for reassessment, it is limited in such reassessment to benefits received. This being, in the opinion of the court, the clear meaning of the part of the section objected to, we need not further consider the argument of counsel for plaintiffs, which, in our judgment, is based upon a wholly erroneous interpretation.

13. "*Third.* Section 401 of the charter is alleged to be unconstitutional and void because, on the appeal therein provided for to the circuit court from the findings of the council upon the objection of any property owner to a reassessment, the jurisdiction of the circuit court is limited to a determination of the amount of special benefits equitably

to be assessed against the property of such person. This, it is alleged, is in contravention of the Constitution of Oregon, Article VII, § 9, which provides: 'All judicial power, authority, and jurisdiction not vested by this constitution, or by laws consistent therewith, exclusively in some other court, shall belong to the circuit courts; and they shall have appellate jurisdiction and supervisory control over the county courts, and all other inferior courts, officers, and tribunals.' In support of this contention, the case of *Hayes* v. *Douglas County*, 92 Wis. 429 (65 N. W. 482, 31 L. R. A. 213, 53 Am. St. Rep. 926), is cited; but we think the authority is not in point. In that case the city charter provided that the limited appeal therein provided for 'shall be the only remedy of the owner of any parcel of land for the redress of any grievance he may have by reason of the making of such improvement.' Section 401 of the charter now under consideration contains no such provision. The question to be considered on appeal is limited, but it is nowhere provided that such appeal shall be the only remedy of the owner of a parcel of land for the redress of any grievance he may have by reason of the making of the reassessment. If section 401 did contain such a provision, we would have no hesitancy in saying that it would be unconstitutional in that respect. The usual remedies which may be afforded by the circuit courts for the erroneous action of any inferior court or tribunal in the absence of the right of appeal, may be invoked by any one feeling himself aggrieved by the proceedings of the city council or officers upon a reassessment.

14. "There is no common-law right of appeal. The right is wholly statutory unless expressly secured by the constitution. The Constitution of Oregon, Article VII, § 9, does not guaranty a right of appeal from every finding by an inferior court or tribunal. While this section confers upon the circuit courts appellate jurisdiction, it leaves the regu-

lation of the mode of proceedings on an appeal and the limitation of the cases wherein an appeal may be taken to be provided by statute. Whenever the legislature determines this question, and fixes the rule in any particular case, the question is thereby settled whether or not the right to prosecute an appeal exists. The supervisory control conferred upon the circuit courts is exercised in this case, as it is in the case of all other inferior tribunals and courts, by writs of review, mandamus, injunction, etc., and in fact it is this right of supervisory control which plaintiffs are now invoking in this case.

15. "*Fourth.* The fourth contention of plaintiffs, that section 401 violates the Constitution of Oregon, Article IX, § 1, which provides for an equal rate of assessment and taxation, may be disposed of with the simple statement that the assessment of property for the cost of street and sewer improvements, in proportion to the benefits derived, is not 'assessment and taxation,' within the meaning of this section of the constitution. This rule is so well settled that it would be superfluous to cite authority in its support.

16. "This, we believe, disposes of all the constitutional questions raised by plaintiffs. But it is further contended by counsel for plaintiffs that, even though the charter is constitutional and valid, and was in full force and effect during the time described in the complaint wherein the reassessment was attempted to be made, still the proceedings of the council and of the city auditor are void, in that they have not complied with the provisions of section 400. But with these questions this court has at this time nothing to do. The relief sought by plaintiffs in this suit is to restrain the members of the city council from passing a certain ordinance, which plaintiffs allege the council is about to pass, adopting and fixing an assessment upon the property of plaintiffs for the cost of Burnside Street improvement. It is a general rule that the courts will not

enjoin or restrain a municipal corporation in the exercise of its legislative functions, unless the proposed legislation is beyond the scope of the corporate power, and its passage would, under the circumstances, work irreparable injury : *Murphy* v. *East Portland* (C. C.), 42 Fed. 308. The courts will not enjoin the passage of unauthorized ordinances, and will ordinarily act only when steps are taken to make them available ; but, if a party is injuriously affected by an ordinance, he may have its validity judicially determined before it is attempted to be executed : 1 Dillon, Mun. Corp. § 308, note, and cases cited ; 2 High, Inj. §§ 1243, 1249. The court having herein determined that the charter of 1903 is constitutional and valid, and that it was so in effect at the time this suit was brought, the making of such reassessment was within the jurisdiction and scope of the legislative power of the council. If the property of the plaintiffs is endangered by any proceedings by municipal officers acting under a city ordinance which is repugnant to the charter, and therefore inoperative and void, relief may be had in some appropriate proceeding ; but this court will not attempt to interfere with the legislative power of the council, or to inquire whether any proposed ordinance is inequitable or improper for any reason before its passage, if the passage of such an ordinance comes within the legitimate scope of the powers conferred upon the council by the legislature.

" There is another reason why this court should not now inquire into the regularity of the proceedings of the council described in the complaint. At the time this suit was commenced, nothing had been done toward making an assessment, except filing a preliminary schedule or assessment by the auditor in conformity with a resolution of the council, and publishing a notice of the time when the council proposed to give a hearing to the parties interested, and make a final assessment. It cannot be deter-

mined beforehand what that assessment will be. We cannot say that the council would assess any benefits whatever to these plaintiffs; nor can the court determine at this time that any alleged defects or irregularities in the proceedings might not be cured by the council and auditor before final action should be taken; neither can the court now say that any injuries that the plaintiffs might suffer could not be corrected by writ of review or appeal.

17. " In this view of the law, it is not necessary to decide any other questions raised upon the demurrer. But for the information of the parties, and for the purpose of possibly preventing or simplifying future litigation, the court will state its views upon one other point suggested by counsel for plaintiffs, and that is as to whether section 400 is retroactive in its effect, and authorizes the council to make a reassessment where the original assessment was made under a prior charter. Section 400 provides:

'Whenever an assessment for the opening, altering, or grading of any street * * which has been or may hereafter be made by the city, has been or shall hereafter be * * declared void * * the council may, by ordinance, make a new assessment * * notwithstanding the proceedings of the council, executive board, board of public works, * * may have been irregular or defective, * * such reassessment shall be made in an equitable manner, as nearly as may be in accordance with the law in force at the time it is made.'

" It will be seen from the above quotation that the power to make a reassessment applies to the case where an assessment has been declared irregular or void, as well as to those which shall hereafter be. It will also be observed that it provides for cases wherein the proceedings of a board of public works were irregular or defective. There is no board of public works provided for in the charter of 1903, but there was a board of public works provided for in the charter of 1898—the charter in force at the time of

the adoption of the charter of 1903. This would seem to indicate that the legislature had in mind the making of new assessments where assessments made under the charter of 1898 were irregular and defective. Again, it will be observed from the quotation, wherein it is provided that such assessment shall be made in an equitable manner as nearly as may be in accordance with the law in force at the time it is made, that the legislature had in mind a possible difference between the law in force at the time of the making of the reassessment and the law under which the original assessment was made. We think there can be no doubt that section 400 is retroactive, and that the council has full power to make reassessments as well where the original assessment was made under the prior charter as where it was made under the charter now in force."

It follows that the demurrers to the complaint were properly sustained, and the decree of the court below is affirmed.                                    AFFIRMED.

---

ON MOTION FOR REHEARING.

MR. JUSTICE BEAN delivered the opinion.

18. The object of this suit was to enjoin the City of Portland from reassessing the property of the plaintiffs for a street improvement previously made in front thereof. The fact that the contractors for the original improvement and the owners of the warrants issued on account thereof were made parties to the suit does not authorize it to be now changed from its original purpose, and converted into a suit by taxpayers of the city to cancel illegal municipal warrants. The decree was in all things affirmed, and there is no reason why the ordinary rule as to costs should not obtain. The petition is denied.    REHEARING DENIED.