KIMBALL VS. THE TOWN OF ROSENDALE.

CONSTITUTIONAL LAW:   *Curative acts of the legislature.*

1. The power of the legislature, by curative acts, to legalize defective proceedings under previous statutes, is dependent on its continued or present power to authorize proceedings like those so sought to be legalized.
2. Ch. 20, Laws of 1877, which purports to legalize the acts and proceedings of officers of the town of Rosendale in the assessment and collection of certain taxes authorized by act of 1871, is invalid, because, since the constitutional amendment of 1871, the legislature has no authority to pass any *special* law for the assessment and collection of taxes.

| | |
|---|---|
| 42 | 407 |
| 79 | 531 |
| 42 | 407 |
| 87 | 590 |
| 42 | 407 |
| 90 | 21 |
| 42 | 407 |
| 95 | 85 |
| 42 | 407 |
| 105 | 381 |
| 42 | 407 |
| 111 | 1 16 |

APPEAL from the Circuit Court for *Fond du Lac* County.

Ch. 78, P. & L. Laws of 1871, contained the following provisions:   1. That whenever the Sheboygan & Fond du Lac Railroad Company should desire any town to aid it under the act, it should make a definite proposition for such aid, and file it with the town clerk, who was required to immediately indorse thereon the time of its receipt by him.   2. That if, within three months after the filing of such proposition, said railroad company should deliver to such clerk a substantial copy or copies thereof, bearing the signatures of a majority of all the persons assessed for taxes in the town as shown by the then last assessment roll, showing their assent thereto, said clerk should, upon request of the company, forthwith, on behalf of the town, subscribe for the stock offered by such proposition, whereupon the town should be bound to pay for the same in accordance with the terms of the proposition: *provided*, that at least ten days before obtaining the signature of any taxpayer to said proposition, the company should cause a copy thereof, with a certain notice attached, to be posted up in at least three public places in each election precinct within the town.   3. That every town subscribing for stock under the act was thereby authorized to issue bonds or orders payable at a future day, and to levy taxes from time to time to pay the same as they should fall due, or to levy a tax or taxes in pay-

ment for the stock subscribed for, at its par value, in accordance with the company's proposition for aid. The other provisions and limitations of the act are unimportant here.

On the 27th or 28th of February, 1871, there was filed with the clerk of the defendant town a proposition of said railroad company, that the town should subscribe for a certain amount of its stock at par, for which the town should issue coupon bonds payable in one, two, three and four years, with interest payable annually. On the 31st of May following, the clerk of the defendant town subscribed for one hundred and nineteen shares of the company's stock; and shortly thereafter, by direction of the town board of supervisors, bonds of the town were issued and delivered for such stock. Afterwards, in the years 1872, 1873, 1874 and 1875, taxes were assessed upon the taxable property of said town, and collected, to pay the principal and interest of said bonds.

Ch. 20, Laws of 1877, declares that the several acts and proceedings of the officers of the defendant town, in subscribing for stock and in issuing bonds of the town to aid in the construction of said railroad, and in assessing, levying and collecting taxes to pay the same, which have been had or done in good faith in attempting to comply with the statute above recited, "are hereby declared legal and valid to all intents and purposes, and shall be so taken and held to be, in all the courts of this state."

This action was brought to recover from the said town certain sums collected from the plaintiff and others (his assignors), as taxpayers of that town, for the payment of said bonds. The complaint alleges that the bonds were invalid, for the reason, among others, that the proposition of the railroad company for aid was filed with the town clerk on the 27th of February, 1871, and that the company did not deliver to said clerk a copy or copies of said proposition signed as required by the statute, *within three months* after that date. Other irregularities alleged need not be here stated.

On the trial, one Pickney, who was then clerk of the defendant town, as a witness for the plaintiff, produced the town records, showing the proceedings upon which the bonds and taxes in question were based. The proposition of the railroad company, with the notice to the taxpayers required by the statute, attached thereto, was received in evidence, with an indorsement thereon signed by H. C. Bottom, town clerk, to the effect that the same was received and filed in his office on the 27th of February, 1871. Plaintiff then offered in evidence an affidavit of one Babcock, purporting to have been made on the 1st of March, 1871, and which appears to have been attached to said proposition and notice, as a part of the town records, which states that on the 27th of February, 1871, the affiant posted copies of the said proposition and notice at certain designated places in said town, and also *on the same day* filed one with the town clerk, and paid him the legal fee therefor. An objection by defendant to the evidence, as incompetent, was overruled. Plaintiff also produced in evidence the record of a meeting of the supervisors of the town, held June 3, 1871, at which it was resolved to issue the bonds in question; and in the preamble to the resolution it is recited, among other things, that the railroad company's proposition for aid, was filed with the town clerk on the 27th of February, 1871.

Mr. Pickney further testified that he found nothing in the records of the town showing when the proposition for aid, *with the names of the taxpayers attached*, was filed by the town clerk; but he produced a wrapper, which he said remained in his office, inclosing the proposition for aid with the names of taxpayers attached, and which was indorsed, "Received and canvassed, May 29th, 1871. H. C. BOTTOM, Town Clerk." Mr. Bottom, as a witness for the defendant, having testified that he was town clerk in 1871, was asked on what day the Sheboygan & Fond du Lac Railroad Company filed with him a proposition for aid under the act of that year; plaintiff's objection to the question was overruled; and the

witness testified that it was filed on the 28th of February; that the canvass of the vote was made May 29th; but that "the majority of the taxpayers had signed the proposition for aid some time before the canvass."

Plaintiff also made proof that the various sums here sought to be recovered were either paid by himself or his assignors under protest, or collected by legal process. The other evidence need not be stated.

It appears that the bonds here in question were transferred by the railroad company before their maturity, for full value.

On defendant's motion, the court ordered a judgment of nonsuit; from which the plaintiff appealed.

For the appellant, a brief was filed by *Taylor & Sutherland*, and there was oral argument by *David Taylor*.

For the respondent, a brief was filed, signed by *Edward S. Bragg*, and there was oral argument by *J. C. Gregory*. They contended that the court, in granting the nonsuit, properly refused to consider the affidavit of Babcock; that it sufficiently appears from Bottom's testimony, that the proposition for aid was filed on the 28th of February, that the canvass was made on the 29th of May, and that the proposition with signatures attached was deposited with the clerk at an earlier date, since he testifies that a majority had signed some time previous to the canvass; that plaintiff was bound to show affirmatively that such proposition with signatures was not deposited within three months after the first filing of the proposition, and had failed to make such proof; that "all reasonable presumptions must be made in favor of the regularity and validity of the proceedings of public officers" (*Tainter v. Lucas*, 29 Wis., 378), and especially should this be the rule where a power has been conferred on such officers to issue bonds, and the bonds have been issued and passed into the hands of innocent parties (*Pendleton Co. v. Amy*, 13 Wall., 297, 305; *Grand Chute v. Winegar*, 15 id., 355, 371 et seq.). 2. That, after having suffered the bonds to be issued and delivered to the company,

and by it delivered for value to an innocent holder before maturity, so that the town was bound to pay them, and after such payment had been made, the plaintiff and other taxpayers could not recover the taxes which had been collected for that purpose. *Rogers v. Burlington*, 3 Wall., 654, 667; *State ex rel. Garrett v. Van Horne*, 7 Ohio St., 327; *State ex rel. Smead v. Trustees*, 8 id., 394, 401.   3. That the curative act of 1877 is valid.   On the general power of the legislature to pass such acts, counsel cited 1 Kent's Com. (5th ed.), 455; Smith's Com., §§ 380–382; Cooley's Con. Lim., 370, 371, and notes, and 381; *Grim v. School Dist.*, 57 Pa. St., 433; Cooley on Tax., 228, note 3; *Dean v. Borchsenius*, 30 Wis., 236, 247. They further contended that this legislative power was not affected in the present case by the constitutional amendment of 1871, because, (1.) Neither the original nor the curative act was properly one for the assessment and collection of taxes, within the meaning of the amendment.   The first act was a grant of authority to aid a railway company; the second cures an imperfect execution of the powers so granted.   The power to levy and collect taxes to pay, was conferred as an incident to such grant.   That power has been held to be a pledge for the security of the debt, and to so far enter into the contract that it cannot be taken away after the debt is incurred.   (2.) The amendment forbids an original grant of power by special act, but does not forbid the legislature to regulate the manner of exercising a power already granted. *Cass v. Dillon*, 2 Ohio St., 607; *State ex rel. Smead v. Trustees, supra.*

RYAN, C. J.   This appeal appears to turn on the validity of ch. 20 of 1877.   For there appears no room for doubt that, considered outside of the curative effect of that statute, there was sufficient evidence to go to the jury; for instance, on the date of filing the proposition of the railroad company.   The affidavit of Babcock was clearly inadmissible; being admitted, it might well be disregarded in granting the nonsuit.   But,

aside from that, the double date indorsed upon the paper, the peculiar testimony of the clerk, the recital in the resolution of the supervisors, and perhaps other circumstances, were sufficient to raise a question of fact upon the date of the actual filing. And we infer from the record that the nonsuit was granted on faith of the validity of the healing statute.

Though a power somewhat arbitrary in its nature, however beneficent its exercise may sometimes be, and closely bordering — if not intruding — on the judicial function (*Greenough v. Greenough,* 11 Pa. St., 489; *Grim v. Weissenberg,* 57 id., 433), it is too late to question the general authority of the legislature, "by other legislation to dispense with obedience to those regulations which have been prescribed by itself for the protection of those who are taxed." Cooley's Tax., ch. 10. The power certainly has limits, which the authorities leave somewhat uncertain. And it extends generally to subjects other than taxation. Cooley's Const., 369–383. And " the healing statute must in all cases be confined to validating acts which the legislature might previously have authorized. It cannot make good retrospectively acts which it had previously no power to permit." Cooley's Const., 381. Curative statutes, and the principles on which they rest, have been frequently upheld by this court. *Hasbrouck v. Milwaukee,* 13 Wis., 37; *S. C.,* 21 id., 217; *Tallman v. Janesville,* 17 id., 71; *Smith v. Cleveland,* id., 556; *Cross v. Milwaukee,* 19 id., 509; *May v. Holdridge,* 23 id., 93; *Hamilton v. Fond du Lac,* 25 id., 490; *Fisk v. Kenosha,* 26 id., 23; *Knapp v. Grant,* 27 id., 147; *Dean v. Charlton,* id., 522; *Phillips v. Albany,* 28 id., 340; *Mills v. Charlton,* 29 id., 400; *Evans v. Sharp,* id., 564; *Dill v. Roberts,* 30 id., 178; *Dean v. Borchsenius,* id., 236; *Single v. Supervisors,* 38 id., 363.

Perhaps the true limit of the curative power of the legislature, as gathered from all the authorities and sanctioned by principle, is, or ought to be, that it can reach things voidable only, not void; defects of execution only, not of authority or

jurisdiction; and is confined to defective proceedings under previous legislative authority. It is true that many most respectable authorities do not set so narrow a limit to the power. In this case, however, we have to deal with the nature, and not with the limit, of the power, and only make a general statement of its limit, as aiding an understanding of its nature.

The power appears to rest in the theory that the authority of the legislature over the subject is a continuing authority; that a later statute may change the *modus operandi* prescribed by a former; that when a statute has authorized a thing to be done, and prescribed the details of proceeding necessary to consummate it, and the thing has been done in pursuance of the authority, but with different or defective details of proceeding, a subsequent statute may authorize, *nunc pro tunc*, the details of proceeding actually taken, as the prior statute might have done. Such details resting in the absolute discretion of the legislature, it is held that a statute may, *ex post facto*, sanction those actually used, to support the statutory proceeding. This may be called ratification, and may be in the form of ratification. But it rests upon the continuing power of the legislature. All the authorities agree, as is apparent without authority, that the legislature cannot ratify what it could not have authorized. And it seems equally apparent that it cannot ratify what it cannot authorize. For the exercise of the power implies legislative authority over the subject, as well at the time of the curative statute as at the time of the enabling statute. Legislative jurisdiction of the subject is equally essential at both times; both statutes resting on the present authority of the legislature to authorize the proceeding and to prescribe its details. Surely a statute could not authorize a new proceeding or sanction an old one, in a matter presently without the scope of legislative authority. We know of no exception to the rule that the power to do a thing or to authorize it to be done *nunc pro tunc*, implies present right.

Viewed strictly in the light of ratification, the same reasoning appears to apply. *Omnis enim ratihabitio retrotrahitur, et mandato æquiparatur.* That is to say, ratification carries present assent or authority back to the time of the thing ratified; implying present power to authorize or assent to what has been already done. This seems to be expressly held in the application of the maxim to legislative ratification in *Weister v. Hade,* 52 Pa. St., 474, quoted and approved in *Mills v. Charlton, supra.* One may ratify things done during disability, after disability removed. But one under disability cannot ratify things done before disability. Possibly it might be claimed that a legislature with constitutionally enlarged power might ratify what it had authorized before the power accrued; which, however, we are not at all inclined to concede. But surely a legislature, constitutionally restrained from authorizing a thing, cannot ratify the thing imperfectly done under authority given before the restraint. It cannot ratify what it cannot do. For its ratification must carry present authority back to the time of the thing ratified.

It is believed that all the cases, here and elsewhere, supporting legislative authority to pass curative statutes, are either expressly or tacitly rested upon the power of the legislature to do, in the present, what it ratifies, in the past. This is true of all the cases in this court cited *supra.* It appears to be the ground on which Judge COOLEY rests the power in both of his admirable works to which we have above referred, and of the cases which he cites. We know of no case holding that the legislature can act *nunc pro tunc* upon a subject intermediately withdrawn from their authority. *Cass v. Dillon,* 2 Ohio St., 607, and *State v. Trustees,* 8 id., 394, cited for the respondent, as well as *Aspinwall v. Daviess Co.,* 22 How., 364, all turned upon questions of constructive repeal of previous statutes by amended constitutions.

No question is made of the power of the legislature to pass ch. 78 of 1871, under which the proceeding ratified in ch. 20

of 1877 was taken. But in the mean time came the constitutional amendment of 1871. By this the legislature is prohibited from enacting special or private laws in nine several cases; the sixth being, " for assessment or collection of taxes, or for extending the time for collection thereof."

It is impossible to mistake the object or spirit of this amendment. For years, the statute books had been incumbered with multitudinous acts of the several kinds prohibited; vicious not only in quantity but in quality. In some of the instances prohibited, they meddled in purely private matters; authorizing what might be done without the authority or with judicial authority. In other instances, they conferred special authority in cases within general authority. And in all instances relating to things *publici juris*, they broke the uniformity and harmony of law so essential to good government; substituting special for general rules, and rendering a large body of the municipal law fragmentary in character, and different by locality. After long endurance of such excesses of legislation, the amendment of 1871 was adopted; in order, so far as it went, to confine legislation to its legitimate objects, to substitute general for special enactments, and to restore order and uniformity to municipal law. And we cannot doubt that, except so far as power over any of the nine several subjects is reserved by other provisions of the constitution, the amendment was intended to withdraw them, and does effectually withdraw them, from any exercise of legislative authority over them, by private or special statutes. As the supreme court of the United States once truly and emphatically said of the eleventh amendment to the federal constitution, withdrawing federal jurisdiction of suits of individuals against states (12 Peters, 731), the amendment of 1871 took from the legislature " ALL jurisdiction, past, present and future," of special legislation on the nine prohibited subjects. There is here no distinction between retrospective and prospective legislation. Since the amendment, and except as saved by some distinct grant of power in

the constitution not repealed by the amendment, these nine subjects are absolutely beyond the pale of legislative jurisdiction to pass private or special enactments. This, upon its face, is the manifest purpose of the amendment; and we cannot give it a different construction. *Qui hæret in litera, hæret in cortice.*

Were this otherwise, the legislature might still, by special statute, notwithstanding the prohibition, change one's name or heir, by repealing a former statute giving him another name or heir; might still alter a highway by repealing a former statute changing its route; might still authorize one to keep a ferry, by extending the time, or authorizing the assignment, of the grant of a former statute; might still authorize the sale of property of persons under disability, by amending defective powers, or extending time, under a former statute; might still locate or change a county seat by repeal or modification of a former unexecuted statute; might still effect the collection of a tax, by giving validity to a levy invalid under a former statute; and so on *ad nauseam.* Most assuredly this would be neither the letter nor the spirit of the amendment. The evil would not be effectually laid; its ghost would continue to haunt the state for a generation or so, disturbing the order of legislation intended to be secured by the amendment.

This view is not only not inconsistent with, but is strongly supported by, what is said upon the subject in *Attorney General v. Railway Cos.*, 35 Wis., 425. There the question was, whether the prohibition in the ninth clause of the amendment, " to grant corporate powers or privileges," took from the legislature the power reserved in the constitution to alter or repeal special corporate charters previously granted. It was held that the amendment was not intended to affect, and did not affect, the reserved power; that the power therefore continued notwithstanding the amendment; and that the prohibition to grant corporate powers or privileges was therefore equivalent to a prohibition to grant corporate charters *de novo.* But the

court came to that conclusion by force of, and rested it upon, a distinct and independent grant of power in the constitution, not reached, or intended to be reached, by the amendment. There is certainly no such clause in the constitution on which the power to pass special curative statutes in aid of the assessment or collection of taxes could rest. That power was appurtenant to the former power to pass special acts for the assessment or collection of taxes. And the appurtenance went with the main power.

As far as the amendment reaches, and as long as it lasts, the peace of the state is secured against the pest of further private or special legislation. And ch. 20 of 1877 can have no curative effect upon the tax in question in this case.

*By the Court.* — The judgment of the court below is reversed, and the cause remanded for a new trial.