L. R. BAIRD, as Receiver of Citizens State Bank of Flaxton, North Dakota a Corporation, Respondent, v. BURKE COUNTY, a Quasi-municipal Corporation, et al., Appellants.

(205 N. W. 17.)

**Statutes — court, in determining legislative intent, may consider history leading up to enactment of statute.**

1. When the courts are called upon to determine and give effect to the legislative intention, it is proper to take notice of such contemporaneous

Note.— (1) Consideration of history in construing statute, see 25 R. C. L. 1035; 3 R. C. L. Supp. 1439; 4 R. C. L. Supp. 1617; 5 R. C. L. Supp. 1360.

(2) Legislative assumption of judicial powers in construing statutes, see 6 R. C. L. 161.

(3) Power of legislature, see 6 R. C. L. 152; 2 R. C. L. Supp. 39; 4 R. C. L. Supp. 386.

history as led up to and probably induced the passage of the law, § 7938, subd. 60, Comp. Laws, 1913; to this end the court should place itself, as nearly as possible, in the situation of the legislature, in order to ascertain the necessity and probable object of the statute.

**Constitutional law — construction of statute is judicial function; statute purporting to construe statutes of prior legislatures, attempting to give meaning to words contrary to natural import, held invalid.**

2. The construction of statutes is a judicial function; the action of the legislature of 1923, purporting to construe the statutes of 1917 and 1919 as legislative blunders, and therein attempting to give a meaning to words used by prior legislatures contrary to their ordinary and natural import, is not binding upon the courts.

**Constitutional law — state constitution is limitation, not grant of power; legislative power limited by federal and state constitutions; initiative and referendum do not change power of legislature.**

3. The state constitution is a limitation, not a grant, of power; the legislature has full power of legislation, except as limited by that instrument and the Federal Constitution. Although the people have reserved legislative power, through the initiative and the referendum, the power of the legislature to act upon all proper subjects of legislation is wholly unchanged. Through the initiative, the people have provided against non-action by the duly constituted representatives in the legislative branch; and through the referendum, an appeal may be taken directly to the people from affirmative action by their representatives.

**Statutes — initiative and referendum held not to affect principle that fundamental purpose is to make every statute speak will of majority.**

4. The initiative and referendum provisions in the Constitution have not altered or affected the principle that the fundamental purpose of legislation is to make every statute, enacted by the legislature, speak the will of the majority of the legislative agents chosen by the people; and whether the legislature, or the people, through the initiative, be the lawmaker, this rule is the same.

**Taxation — primary purpose in law authorizing compromise to taxes against bank stock, stated.**

5. The primary purpose of the legislature in enacting chapter 300, Sess. Laws, 1923, was to facilitate the collection by county commissioners and the State Tax Commissioner of a contribution from banks in the state, which had not paid in conformity with the voluntary agreement referred to in the act. In this chapter the legislature intended to give recognition to this voluntary agreement and to put into the hands of taxing officials additional means to enforce collection from the few banks which had taken advantage of the

absence of any statutory authority for levying or collecting a capital stock tax during the years in question.

**Taxation — effect of striking section from statute, relating to authority of county commissioners and tax commissioner to compromise certain taxes on bank stock, held to leave remainder self-contradictory.**

6. The effect of striking § 2 from chapter 300, Sess. Laws, 1923, through the referendum, is to strike from the act its primary purpose and to leave the remainder self-contradictory and inconsistent upon its face. The legislative purpose, unequivocally expressed in the law as passed, is completely subverted, if effect be given to what remains.

**Statutes — when striking certain clause of statute, through referendum, causes entire statute to fall, stated.**

7. If the result of striking a certain clause, section or part of a statute, through the referendum, be to remove the inducement therefrom so that the remainder is a substantial departure from the legislative purpose, or effects an object foreign to and not within the contemplation of the lawmaking body when the law was passed, the entire statute falls.

Opinion filed August 11, 1925.

Constitutional Law, 12 C. J. § 167 p. 745 n. 1, 2; p. 746 n. 5; § 247 p. 811 n. 26. Statutes, 36 Cyc. p. 942 n. 21, 24, 24 New; p. 1128 n. 54, 55, 56; p. 1137 n. 41, 43; p. 1143 n. 86, 87.   Taxation, 37 Cyc. p. 1191 n. 30 New.

Appeal from District Court of Burke County, *Lowe,* J.
Affirmed.

*T. H. H. Thoreson,* Tax Commissioner and *B. L. Wilson,* for appellants.

The power of taxation is vested in the legislature and except as restrained in the Federal Constitution its exercise for public purposes is unlimited.   Gautier v. Dittmar (N.Y.) 97 N. E. 464.

The legislature has plenary powers in the matters of taxation, except as such power is restricted by the Constitution.   Houch v. Little River Drainage Dist. 239 U. S. 254.

The character and extent of taxes imposed are within the legislative discretion when constitutional limits are not violated.   Pullman Co. v. Knott, 243 U. S. 477.

Nothing but express constitutional limitations on legislative authority can exclude anything to which the authority extends from the grasp of the taxing power, if the legislature shall at any time select it for

revenue purposes. Harders Fireproof Storage Co. v. Chicago, 85 N. E. 245.

Except as the people have withheld it by constitutional inhibition, plenary power of enacting laws is reposed in legislature.

A statute is retroactive which takes away or impairs vested rights, creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions already past. Butte & Superior Min. Co. v. McIntyre County, 229 Pac. 730.

When a statute is expressly retroactive, and the object and effect of it is to correct an innocent mistake, remedy a mischief, execute the intention of the parties, and promote justice, then, both as a matter of right and of public policy affecting the peace and welfare of the community, the law should be sustained. Mechanics Sav. Bank v. Allen, 28 Conn. 97.

The court will not attempt to decide that there may not in extreme cases be a legitimate statutory enactment imposing a retroactive tax for previous years upon a class of property not then subject to taxation at all. First Nat. Bank v. Covington, 103 Fed. 523.

The legislature of a state cannot validate a tax which is prohibited by the laws of the United States, but it is competent for it to sanction retroactively such proceedings in the assessment of a tax as they could have legitimately sanctioned in advance. Exchange Bank Case, 21 Fed. 99.

L. J. Palda, Jr., C. D. Aaker, and C. E. Brace, for respondent.

Where there is an utter absence of those things which are inherently essential to a valid tax, equity cannot require payment as a condition to relief from the proceedings. State Finance Co. v. Beck, 15 N. D. 374.

But a law is not necessarily invalid because it is retroactive. Such law is invalid only if it violates the constitutional guaranties that no bill of attainder, ex post facto law or law impairing the obligations of contract shall ever be passed. U. S. Const. art. 1, § 10; N. D. Const. § 16. Unless violative of some right, guaranteed by the state or Federal Constitution, tax law may be given a retroactive effect. 25 R. C. L. p. 795; McQuillin, Mun. Corp. § 709.

Where the taxing officers have power to tax, but exercise that power irregularly or defectively, the legislature may generally make the tax

valid by subsequent legislation. But where the taxing officers have no such power to levy the particular tax in question, but attempt to do so, the legislature can seldom if ever make such a tax valid. A. T. S. F. R. Co. v. Woodcock, 18 Kan. 20.

Courts are not concerned with the policy reflected in legislation or with the motives of the legislature. State ex rel. Farmers State Bank v. Wallace, 48 N. D. 803.

*A. G. Divet,* amicus curiæ.

So he who was never bound, either legally or equitably, cannot have a demand created against him by mere legislative enactment. Cooley, Const. Lim. 7th ed. 528 et seq.

Curative statutes may cover any mere irregularity in the course of the proceedings for the enforcement of a lawful demand, but they can never cure a want of jurisdiction, either in tax proceedings or those in any other description. Nothing is a tax simply because of being called so; but any proceedings by which a man's property is to be taken from him on a claim which has no other basis than the naked declaration of the legislature that it shall constitute a demand against him is unconstitutional and void as not being according to the law of the land, but, on the other hand wholly unwarranted by legal principles. Hart v. Henderson, 17 Mich. 218.

A tax fraudulently and corruptly laid and unjust and partial in its operation against the provisions of existing laws could not be so validated or aided or made effectual by subsequent re-assessment. Dean v. Borchsenius, 30 Wis. 236.

The limit of legislative power under the Constitution is to go back and cure errors not jurisdictional to the exercise of the taxing power. Northwest Improv. Co. v. Oliver Co. 38 N. D. 57, 62; G. N. R. Co. v. Grand Forks County, 38 N. D. 1.

It may be stated as a general rule that taxpayer has the same right to notice and to an opportunity to be heard upon the question as to the validity and amount of a tax levied upon property that has been omitted from the assessment rolls that he has in the case of an original assessment. So, also when an assessment is increased, it is necessary to give a property owner notice and hearing. 26 R. C. L. 352; State ex rel. Miller v. Leach, 33 N. D. 513.

A statute giving a state officer unlimited power and discretion to fix

the valuation of property which he thinks has been assessed for too little, without any opportunity for the taxpayer to be heard except in defense of a suit to collect the taxes, is in violation of the state Constitution, which provided that property shall be assessed under general law, by uniform rules, according to its true value, and which also provides for assessors as county officers. Adams v. Tonella (Miss.) 22 L.R.A. 346.

While it is undoubtedly true that the legislature cannot retroactively cause an act to mean that which it did not mean, etc. Duffiend v. Ashhurst, 102 Pac. 820; Weisberg v. Weisberg, 98 N. Y. Supp. 260.

It is undoubtedly true that there may be cases where one part of a statute may be enforced as constitutional, and another be declared inoperative and void because unconstitutional; . . . but that can only be done where the statute remaining after the elimination of the unconstitutional part is in itself a complete law and such a one as it is presumed the legislature would have passed without the rejected portion. Angel v. Cass County, 11 N. D. 265.

JOHNSON, J.   Plaintiff brings this action to restrain the collection of certain taxes on bank stock for the years 1920 and 1921. The assessment was attempted under § 2115, Comp. Laws 1913, as amended by chapter 61, Sess. Laws, 1917, and, under § 1, of chapter 220, Session Laws of 1919, the stock is assessed at 100 per cent of its value. It is the contention of the plaintiff that the assessments are without statutory authority and void; that bank stock was expressly exempt and the law authorizing the taxation thereof repealed by chapter 62, Special Session Laws, 1919; and that it was so held by this court in State ex rel. Farmers State Bank v. Wallace, 48 N. D. 803, 187 N. W. 728.

The plaintiff demurred to the answer. The theory of the defendant as disclosed in the answer and in the brief and the oral argument of the tax commissioner, is that chapter 300, Session Laws of 1923, validates retroactively the assessments, and furnishes the requisite statutory warrant for the tax. The demurrer was sustained and the defendant appeals.

As a result of the action of the legislature in enacting chapter 62, Special Session Laws, 1919, repealing the existing statute, there was

left no law authorizing the assessment of taxes against bank stock. Chapter 62, supra, was a specific repeal, and this court so held in State ex rel. Farmers State Bank v. Wallace, supra. There was no change in this situation until the legislature convened in 1923. It appears, however, that notwithstanding the repeal, officers in some counties of the state attempted to levy and assess taxes against bank stock for the years in question. Such assessment was manifestly illegal, in view of the specific exemption of chapter 62. On this question there is no dispute. A large number of banks felt, however, that a fair stock tax should be levied and were willing to pay accordingly. As stated by the tax commissioner in his brief: "A majority of the banks in the state of North Dakota realized this truth and though the bank stock was held by this court to be exempted from taxation, voluntarily paid into their respective county treasuries, what they considered was a fair amount of tax against their property. These banks took the position that even though they were inadvertently exempt from taxation by the repeal of the moneys and credit law, nevertheless, they had enjoyed the benefits of protection under our government and were morally obliged to contribute their just share towards the government." As a result of this feeling on the part of the banks, a settlement was made whereby the banks agreed to pay a sum equivalent to 50 per cent of the amount of the tax which had originally been assessed against them under the classification as contained in chapter 220, of the Session Laws of 1919. That is, they agreed to pay upon the same basis of valuation as live stock, agricultural implements, tools and machinery, etc., under class 2 of section one of said chapter. "Nearly all of the banks of the state" paid according to this agreement. See § 2, chap. 300, Sess. Laws, 1923. The plaintiff, and a few others did not, with the result that it escaped entirely the payment of any stock tax during this period. It is stated in the brief of one of the counsel that the banks thus voluntarily paid into the public treasury about $1,000,000.

This brings us to a consideration of chapter 300 of the Session Laws of 1923. The tax commissioner says that the "issues squarely before this court are as to whether or not chapter 330, Session Laws, 1923, is a valid law, and whether or not the legislature had the power and authority to validate the taxes for 1919, 1920, 1921 and 1922."

The title to chapter 300, supra, discloses clearly the purpose of the act. It reads as follows:

"An act validating taxes assessed against bank stock in the years 1919, 1920, 1921 and 1922, authorizing boards of county commissioners and the tax commissioner to compromise such taxes upon bank stock for 1919, 1920, and 1921, as have not been paid, and confirming and ratifying such settlements as have been made."

Chapter 300 reads:

Sec. 1. "All taxes levied and assessed in the years 1919, 1920, 1921, and 1922 upon bank stock are hereby validated and confirmed and shall be given full force and effect by all administrative and judicial officials notwithstanding the language contained in § 1 of chapter 62 of the Special Session Laws of 1919 and § 1 of chapter 230 of the Laws of 1917 purporting to include stock as money and credits in the exemption given to money and credits."

Sec. 2. "Boards of County Commissioners and the tax commissioner are hereby authorized to compromise and settle taxes assessed upon bank stock for the years 1919, 1920, 1921, which have not already been compromised, settled, and paid upon the same basis of settlement upon which nearly all of the banks of the state have paid taxes for such years. The settlement of the taxes upon bank stock for the years 1919, 1920, and 1921, heretofore made by the tax commissioner and carried into effect by boards of county commissioners is in all things hereby ratified and confirmed."

Sec. 3. "It is hereby declared to be the public policy of this state, recognized for many years, that all classes of property owners possessing a considerable amount of taxpaying ability shall contribute to the expense of government in proportion to their relative abilities to pay, and that owners of bank stock constitute a class of property owners possessing such tax paying ability, and that the inadvertent inclusion in the legislative enactments of the 1917 session and the 1919 special session of a misstatement of the law and of fact in that it is therein inferentially stated that corporate stock is a credit, does not and did not indicate a deliberate departure from established legislative policy, and it is further declared to be in harmony with sound public policy that bank stock of the several banks should be assessed upon and should be taxed upon a uniform basis, and that such stockholders as have not

paid taxes for the years in question should be required to pay taxes upon the same basis as those who have already complied with the terms of the settlement above referred to, and that this exercise of the limited power to enact retrospective legislation is in furtherance of firmly established and universally recognized principles of justice and equity."

In due time a petition, pursuant to the referendum provision in the constitution, was filed, asking that § 2 be submitted to the voters at the general election to be held on November 4, 1924. The operation of the section was accordingly suspended. Section 25, Constitution, article 26 of amendments. The section was disapproved at the polls and eliminated from the act.

It is contended by the plaintiff that chapter 300, supra, is a legislative declaration that taxes assessed against property actually exempt from taxation by a statute duly enacted by a former legislature, shall be valid and enforceable; that is, the legislature of 1923, it is said, attempted to create an obligation to pay taxes on this class of property for the years in question, notwithstanding a prior legislative assembly had expressly and affirmatively declared that such property should be wholly exempt from taxation, and no law authorizing such a tax was in existence when the assessment was made. Plaintiff contends that one legislature cannot thus reach back and annul the affirmative action of a prior legislature and, at the expense of the taxpayer, retroactively alter the legislative policy of the past. The statute is condemned as an unconstitutional attempt to deprive a person of property in violation of fundamental rights secured by the constitution; no hearing whatever has been or is afforded the taxpayer before the obligation to pay becomes fixed; and it is contended that chapter 300 violates § 175 of the state constitution in failing to define the purpose for which the proceeds of the tax shall be used.

Lastly, it is urged that the effect of the referendum, in eliminating § 2 from the act, must, in legal effect, be the same as if the entire chapter had been referred to and disapproved by the people. To state this last proposition somewhat differently, the plaintiff contends that § 2 was the inducement that led the legislature to enact chap. 300, and that in eliminating that section, the remaining part fails wholly to express the true intention of the legislature; the same rule as when a part of a statute is held unconstitutional, it is said, must be applied. The con-

.tention is that the legislature would not have enacted chapter 300 but for the purpose expressed in § 2, and elsewhere manifested in the act; that the referendum is merely a check and not intended to be used as machinery for affirmative legislation; and that if the portion of a statute which constitutes its fundamental purposes and without which the whole would not have been enacted by the legislative branch of the government, is taken out of it by means of the referendum, the entire statute must fall.

It will thus be seen that two main propositions are advanced in this case, one involving the constitutionality of chapter 300, and the other the effect of eliminating § 2 therefrom by means of the referendum. Logically, we must consider the second contention first, and if that be without merit, then, and not till then, it will become our duty to examine the constitutional questions raised, for, manifestly, if the effect of the referendum be as claimed, there remains no law the validity of which can be in issue.

The tax commissioner unequivocally asserted in the oral argument, in response to a question on that subject, that if chapter 300 was a constitutional enactment, the legislature could retroactively authorize the making of assessments against and the collection of taxes upon property which prior legislatures had partly or wholly exempted from taxation. It will thus be seen that the effect of sustaining the contention of the defendant would be of the most far-reaching importance, and might vitally affect churches, lodges, hospitals, home owners, farmers and individuals whose property has, at different times, since statehood, been partly or wholly free from the burden of public taxation. By extending the tax back far enough, and making it no more than reasonably large each year, actual confiscation of such property would almost inevitably result. To say that a legislature will not do it does not in the least meet the situation. It is a question of power; whether a legislature will ever exercise it, is quite another matter. The fact remains, the legislature, upon the face of the enactment as it now stands, has attempted this very thing. He would be a bold man who would hazard his reputation on a prophecy that a future legislature would never do a given thing.

Chapter 300, Sess. Laws, 1923, is in the nature of a curative or a validating statute. It becomes important, therefore, to take notice of

the circumstances that led to the enactment and which the legislature had in view when the law was passed. Under § 7938, subdivision 60, Comp. Laws, 1913, it is our duty, when called upon to determine and give effect to the legislative intention, to take judicial notice "of such contemporaneous history as led up to and probably induced the passage" of the law. As said by the Supreme Court of New York, in People ex rel. Peake v. Columbia County, 43 N. Y. 132: "The occasion for the enactment of a law may always be referred to in interpreting and giving effect to it. The court should place itself in the situation of the legislature and ascertain the necessity and probable object of the statute and then give such construction to the language as to carry the intention of the legislature into effect so far as it can be ascertained from the terms of the statute itself." In Ex parte Corliss, 16 N. D. 470, page 481, 114 N. W. 962, this rule of construction—"in the light of contemporaneous history"—is recognized and applied in construing the constitution.

In § 1 of chapter 300, the legislature, in effect, undertakes to construe chapter 62 Laws, Special Session 1919, and chapter 230, Sess. Laws, 1917. It is there said, in substance, and argued at the bar, that the legislature inadvertently exempted bank stock from taxation by purporting to include this class of property with moneys and credits; in § 2 of this chapter the legislature assumes to declare "the public policy of this state, recognized for many years, to be, and to have been that persons owning property and having tax paying ability, shall contribute to the expense of government in proportion to their relative abilities to pay," and that the legislation of 1917 and 1919 was "a misstatement of the law and of fact, in that it was therein inferentially stated that corporate stock is a credit," and that these enactments do "not and did not indicate a deliberate departure from established legislative public policy." It is too clear for argument that one purpose of chapter 300 was to construe prior legislation. The construction of statutes is distinctly a judicial function; the duty of making the law or of declaring what it shall be is a legislative function. The division of powers of government into legislative, executive, and judicial, lies at the very foundation of our constitutional system. It has been the belief of constitutional lawyers, as it was of those who laid the foundations of the government, that such separation of powers was wise and

best calculated to preserve the liberty of the individual against unwarranted encroachments. Each branch under this constitutional theory of departmental division is entrusted with distinct powers and duties; one branch may not assume to perform the functions entrusted to another. The executive, although possessing the power of veto, cannot legislate; the legislature possesses no judicial or executive power and may not undertake either to enforce existing laws or to declare their meaning so as to bind the executive or the judiciary; and the judiciary possesses no power, either of legislation or of executive administration of existing laws. Cooley, Const. Lim. 7th ed. 136–140. See also People ex rel. Mutual L. Ins. Co. v. Jenkins, 16 N. Y. 424; Weisberg v. Weisberg, 112 App. Div. 231, 98 N. Y. Supp. 260. We are constrained to the conclusion, therefore, that the action of the legislature of 1923, purporting to construe the statutes of 1917 and 1919 as a blunder, in attempting to give a meaning to words contrary to their ordinary and natural import, and in impliedly criticizing prior legislatures, is of no effect, and not binding upon any other branch of the government, or upon this court. 12 C. J. 811. To hold otherwise, would be to exalt the legislature above the other departments of government, to make it supreme, and in a large measure put an end to the security of liberty and property.

Provisions for the initiative and referendum have been in our state Constitution for more than ten years. In 1918 the present article 26 of Amendments was adopted by the people. This article provides for the initiative and referendum in legislation, and in the first paragraph we find: "The legislative power of this state shall be vested in a legislature consisting of a senate and a house of representatives. The people, however, reserve the power, first, to propose measures and to enact or reject the same at the polls; second, to approve or reject at the polls any *measure* or any *item, section, part* or *parts* of any measure enacted by the legislature."

The state Constitution is a limitation, not a grant of power; it is, in this respect, fundamentally different from the Federal Constitution, which is a grant of power to the Federal Government. The state legislature, therefore, has full power of legislation except as limited by the Federal or the state Constitution. The initiative and the referendum neither add to nor subtract from that power; except as its scope is re-

stricted by constitutional limitations, the power is still plenary in the legislature. Though the people have reserved legislative power, the representative character of the government is fully retained. See Kadderly v. Portland, 44 Or. 118, 145, 74 Pac. 710, 75 Pac. 222. By the initiative, the people have provided against *non-action* by their duly constituted representatives in the legislative branch; and by the referendum, an appeal may be taken directly to the people from *affirmative action* by these representatives. In the one case affirmative legislation results—the people, without the intervention of representatives, declare what shall be law; in the other case, the people veto affirmative action by their agents; in the one instance we have a constructive exercise of legislative power; in the other, merely negation.

It may, therefore, be postulated that these new constitutional provisions have not in any manner altered the fundamental purpose of legislation—to make every statute enacted by the legislature speak the will of the majority of the legislative agents chosen by the people. The statute represents the will, purpose or intention of the lawmaker. Be the lawmaker the legislature or the people, through the initiative, this fundamental rule is the same. See State ex rel. Evans v. Stewart, 53 Mont. 18, 161 Pac. 309. The legislative "intent is to be determined from a general view of the whole act, with reference to the subject matter to which it applies and the particular topic under which the language in question is found." 36 Cyc. 1128.

What was the primary purpose the legislature of 1923 had in view when chapter 300 was enacted? There is no dispute on this important question. On this point the tax commissioner in his brief says:

"When the Legislature met in 1923 it was found that there were, as said before, a few banks in the State which had refused to contribute any tax money for the years 1920 and 1921. Many of the banks of the state had entered into a compromise with their respective counties whereby they agreed to pay fifty per cent of the taxes which had originally been assessed against the said banks, under the classification as contained in chapter 220, of the 1919 Session Laws. The Legislature therefore, passed chapter 300 of the Session Laws of 1923 for the express purpose of forcing these other banks which had contributed nothing, to contribute *for the years in question,* and at the *same time to*

*validate the compromise agreement which* had been entered into by some of the counties and the various banks."

The background of the legislation is clear to the minutest material detail. All the facts were publicly and generally known when that legislature convened. This court, in an opinion filed on February 21, 1922, in State ex rel. Farmers State Bank v. Wallace, 48 N. D. 803, 187 N. W. 728, had held that chapter 62 of the laws of the Special Session of 1919, expressly repealed prior statutes authorizing the assessment of bank stock, and affirmatively exempted that class of property from taxation. It became a subject of public discussion throughout the state that there was no law authorizing the taxing of bank stock. Banks were still subject to taxation upon other classes of property to the same extent and in the same manner as individuals, but the law authorizing the public authorities to levy a tax upon capital stock had been repealed, with the result that assessments which had been made before that decision was announced were thereafter understood to be void. During the year 1922, representatives of the banks of the state met in conference with the Industrial Commission. The result was, as stated by the tax commissioner, that a settlement was arranged, whereby the banks agreed to pay into the public treasury upon their capital stock, a tax equal to 50% of the amount supposed to have been authorized under the classification as contained in class 1 of § 1 of chapter 220, of the Session Laws of 1919. This arrangement was voluntary; there was no legal or statutory duty to pay any capital stock tax whatsoever, by reason of the affirmative action of the Special Session of 1919 exempting this property from taxation. As said by counsel for the defendant, the agreement on the part of these taxpayers to contribute voluntarily to the support of the government was made because of a feeling that a fair capital stock tax should be paid. It is said, in the brief of the tax commissioner that there was no statutory authority for the settlement which resulted in the payment of about $1,000,000 into the public treasury. This is true. Perhaps the legislatures of the past have naively supposed that if the unexpected happened and an individual ever felt so conscience stricken as to offer to repair voluntarily a legislative omission to tax him sufficiently by offering a substantial contribution to the public treasury, public officials would waive the formality of prior authorization and accept the donation in behalf of

the public. The tax commissioner might well have added that the authorities who participated in the negotiations which resulted in the agreement, had no power to compel a contribution of this kind from the banks; the agreement was extra legal and voluntary in every respect. Under it, the banks paid into the public treasury a large sum. Of this arrangement no legislative ratification was necessary.

A very few banks, some of which like the plaintiff, have since been forced to close, did not make the voluntary contributions, as did "nearly all" the others. When the legislature of 1923 convened, this situation was well known and fully understood by its members. It was a fact of general notoriety that most of the banks had voluntarily paid what they and the majority of the taxing officials of the counties of the state deemed a fair tax; that a small number had made no such contribution; and that there was no statutory warrant or authority for collecting or levying any bank stock tax for the years in question, but, on the contrary, an affirmative exemption of such property. This was the situation when Senate Bill No. 375, now chapter 300, was introduced, and came up for consideration. In § 1, the legislature attempts to validate all the assessments of bank stock made for the years 1919, 1920, 1921 and 1922. It must be noted that these assessments were wholly void because the Special Session of 1919 had expressly exempted this class of property from taxation; it must also be noted that the assessments validated on the face of section 1 for the years there named, were *double* the amount which the banks voluntarily agreed to pay and which had then been paid by "nearly all" of them. Section 1 takes no note whatever of or gives credit for the voluntary payments. Section 2, however, furnishes the key to the primary purpose in enacting the law. Although stricken from the act, we may consider section 2 for the purpose of determining whether it was the inducement to the remaining portion and what the part not referred means. See Connolly v. Union Sewer Pipe Co. 184 U. S. 540, 46 L. ed. 679, 22 Sup. Ct. Rep. 431. In this section boards of county commissioners and the tax commissioner are authorized to "settle taxes, assessed upon bank stock for the years 1919, 1920, 1921, *which have not already been compromised, settled, and paid upon the same basis of settlement upon which nearly all of the banks of the state have paid taxes for such years."* The last sentence of this section on its face ratifies and confirms the

settlement and payments already made. It is obvious that the sweeping language of section 1 must be considered in connection with § 2; and when so considered, it becomes plain that the legislative intention was to facilitate settlement with those banks which had not complied with the agreement to which reference has been made. The tax commissioner says that chapter 300 was passed for the purpose of "forcing those other banks which had contributed nothing, to contribute for the years in question." Indeed, it is clear that the nonpaying banks, upon the face of chapter 300, were confronted with the alternative of paying the full amount of the assessment for the years in question, if they persisted in neglecting to pay into the public treasury in conformity with the voluntary agreement. It is not difficult to discern the real purpose of the law makers. Upon the face of the act, they put into the hands of the tax commissioner and the boards of county commissioners, a power which enabled them to pay to the nonpaying banks: —"If you refuse to pay in accordance with the voluntary agreement which 'nearly all of the banks of the state' have carried out, you will be required, under chapter 300, to pay at least *double* that amount." This chapter clearly recognized the settlement made, approved it expressly in section 2, and made it the occasion for the enactment of a law to assist public officials in compelling non-complying banks to contribute to the support of the government upon the principle which had been made the basis of the agreement. Chapter 300 was distinctly not enacted for the purpose of compelling *all* the banks, as well those which had paid about $1,000,000, into the treasury, as those which had not paid anything for the years in question, to pay a 100 per cent assessment under the classification of chapter 220 of the Session Laws of 1919. We are not required to speculate, or suggest that the legislature did not intend to accomplish an injustice towards "nearly all," to use the words of the legislature, of a class of taxpayers who had voluntarily assumed an additional tax burden. That no such purpose was intended, is, in the act itself, made as clear as language can make it. In § 3 the legislative intention again made plain. It is there said, in substance, that the purpose of the enactment is to require stockholders who "had not paid taxes for the years in question . . . to pay taxes upon the *same basis as those who have already complied with the terms of the settlement above* (in § 2) *referred lo.*"

What is the effect of removing § 2 from the act. It leaves the act bereft of its primary purpose and the two remaining sections self-contradictory and inconsistent. Section one purports to validate *all* assessments made during the years in question, notwithstanding the specific exemption of chapter 62, Special Session Law of 1919; this meant an assessment of 100 per cent, just double the amount stipulated in the voluntary agreement, to which we have adverted, and which the legislature specifically approved in § 2. Section 3, after declaring it to be the policy of the state that persons of tax paying ability shall contribute a just proportion to the support of the government provides that it is "in harmony with sound public policy . . . that such stockholders *as have not paid taxes for the years in question*" should pay on the basis of the voluntary settlement. Section one, therefore, is an unequivocal direction to public officials to enforce a 100 per cent assessment; § 3 affirms that a payment of a 50 per cent assessment would comport with public policy. It is not necessary to dwell at length upon the inconsistencies on every hand when we attempt to read section one and three together as if they constituted a complete enactment. Section 2 gives express authority to public officials to accept less than a 100 per cent assessment; that was stricken out and it must be presumed that the people in striking it meant just what they did, namely, that these officials should have no such authority. That being the case the recitals of public policy in § 3 as to the payment of a 50 per cent assessment become inconsistent with and contradictory of the remainder of the act. We are confronted with a statute some parts of which are inconsistent and self contradictory, which purports to command and authorize public action directly contrary to the avowed purpose of the whole law, and which does not express the real purpose or intention of the legislature that enacted the law or of the people to whom a single paragraph was referred. Whereas the legislature recognized the justice and the fairness of a voluntary agreement to pay taxes by a class of taxpayers expressly exempted by a prior legislature from such a tax, and sought to compel a few members of that class to pay upon the same basis, the act, with § 2 eliminated upon its face, compels taxing officials to collect from this class of taxpayers a 100 per cent assessment without credit for the amount which they had voluntarily paid. It is difficult to conceive of a situation where a legislative purpose, unequivocally

,ssed, could be more clearly subverted. We think it is too plain argument that the purpose, intention, and result of chapter 300 with § 2 stricken out, are fundamentally and essentially different from the purpose and intention of the enactment with § 2 in it.

A direct out-growth of the principle that a statute shall be construed so as to speak the purpose of the lawmaker is the universally recognized rule that if a legislative act be in part unconstitutional, the valid portion shall stand unless the result be one not contemplated, or desired by the legislature. In such a case, "the question to be determined is whether the obnoxious part is an inducement of the whole act, or whether it is merely an incident thereto. The test to be applied in determining whether the unconstitutional provision in a statute invalidates the whole enactment is the answer to the following questions: . . . (2). Is the unconstitutional part so connected with the general scope of the whole as to make it impossible to give effect to the apparent intention of the legislature, after the clause or part is stricken out." State v. Bickford, 28 N. D. 36, 147 N. W. 407, Ann. Cas. 1916D, 140. Par. 19 of the syllabus. If striking out a part of the law results in a substantial departure from the legislative purpose, or effect an object not within the contemplation of the lawmaking body when the law was passed, and it cannot be presumed that the law would have been passed without the void part, the entire statute falls. See also Martin v. Tyler, 4 N. D. 278, 25 L.R.A. 838, 60 N. W. 392, These propositions are firmly grounded in our legislative system and are consistent with the theory of representative government. A contrary conclusion would be a vital departure from the principle which lies at the root of our form of government, namely, that governmental activity, whether legislative or administrative, shall reflect the *deliberate purposes* of the responsible representatives of the people.

This brings us to a consideration of the very important question of whether a principle analogous to the rule of constitutional law, to which we have already adverted, must be applied and chapter 300 held wholly inoperative.

Upon this question we have derived no material aid from the authorities. So far as we can find, the case at bar on this point is one of first impression. But see State ex rel. Barrett v. Dallmeyer, 295 Mo. 638, 245 S. W. 1066.

May the inducement of a legislative act be stricken by means of the referendum, and must the remainder, notwithstanding the purpose of the lawmakers has been completely subverted as a result of the elimination, be given effect and enforced as an *act of the legislature?* It is not disputed that the answer must be negative if we apply the rule when the part of an act which constitutes its inducement is held unconstitutional and void. It is strongly urged that the same result must follow when, through the referendum, the legislative purpose is completely frustrated or altered by striking a portion. Upon what sound principle can a distinction be drawn under the facts in this case? We see none. Upon this vital point counsel for appellant is silent, both in the brief and the oral argument. A section of a statute is held void by the courts because the people have said to the legislature through the medium of a written constitution, "We forbid." If the void portion is the inducement, the entire act falls. In addition to the limitations upon legislative power, prescribed in the constitution, the people have reserved the power to say, after the fact, through the referendum, "We forbid", and strike a part of or the whole enactment. If a part only be disapproved, the remaining portion stands, if at all, as an *act of the legislature,* not as one that has come into being or derived any force through the exercise of the power of direct legislation through the initiative. If the stricken portion be the very soul of the act, we see no reason why the remainder should be given effect as the will of a legislative body. The reserved power, known as the referendum, is negative; it is entirely distinct and fundamentally different from that of the initiative. Through the referendum a definite number of electors may have submitted to the people as a whole a specific act, or part of an act, for approval or disapproval. Nothing is before the electorate but the concrete proposition, as advertised in the election notices and as appearing on the ballot, whether a certain law, or a specified part of a certain law, shall be approved or disapproved. From the standpoint of the effect of an adverse referendum of a part of an enactment upon the legislative intention, it is difficult to discover any distinction in principle between excision of a section or a part of a law by the referendum and the same operation through the decision of a court that such section or part is void because unconstitutional.

In rejecting a part only of a legislative act, it is suggested that the

people approve the remaining portion by necessary implication. If that position be sound, it would seem to follow that the people *and the legislature* have united in the exercise of the legislative function in passing that part which remains after an excision of a portion by the referendum, and that the remainder, therefore, should express the *will, purpose, or intent of both*. That is, on appellant's theory of approval by implication, it necessarily follows that the people have taken an affirmative part in legislation through the referendum, and chapter 300, as it is now, should reflect the joint intention of the people and their agents in the legislature. This it does not do. Such a theory, practically applied, would result in a peculiar paradox. Judicial authority leans to another and a sounder view, namely; that the legislature and the people, through the initiative and referendum, are coordinate legislative bodies. Rose v. Port of Portland, 82 Or. 541, 162 Pac. 498. The position is largely academic in the instant case. If accepted as sound, it would in no manner aid defendant. There are persuasive reasons why the contention cannot be maintained. Under the constitutional amendment providing for the initiative and referendum, for example, it is provided that a measure initiated or referred cannot be amended or repealed by less than a two thirds vote of the members of the legislature. Sections one and three were not referred, but were approved by implication, says the tax commissioner. It would seem to follow, if the argument be sound, that the legislature is powerless to amend sections one and three save by a two thirds vote although only section two was referred. The result suggested demonstrates the fallacy of the contention. There is no approval of sections one and three by implication, or otherwise. They were simply left alone by the sponsors of the referendum and must stand as reflecting the purpose and intention of the legislative assembly, if given effect as a law. As we have seen, the portion of chapter 300, remaining after section 2 has been stricken, is a complete perversion of the legislative purpose existing when the full chapter was enacted. The hulk that is left expresses the intention neither of the legislature nor of the people. It is a malformed creature, a monstrosity without shape or soul, with no "pride of ancestry and no hope of posterity."

If the rule which appellant urges be adopted, some startling results would follow. Suppose a legislature should enact a complete political

code and at the end thereof append a section expressly repealing by number all existing statutes on the same subject. Suppose an unfavorable referendum against all the new code, except the repealing clause. Can it be possible that any person in his right senses would attribute to the legislature an intention to enact the repealing clause, or to the people a purpose to leave no law upon the subject dealt with in the political code? The question answers itself and demonstrates the soundness of the construction we have put on the referendum provision in the Constitution.

It may be in the interest of clear thinking on the subject to draw attention to the fact that the *people* do not start the machinery of the referendum. That is done by individuals whose identity may be quite unknown and who have no substantial legal responsibility for the outcome. It is unfortunate that such an instrumentality, powerful for good, if properly used, may be set in motion without able, painstaking, and conscientious scrutiny into the effect of directing the referendum against a fraction of a legislative enactment. Irresponsible or incompetent leadership in this method of legislation, is, no less here than in other branches of the public service, fraught with grave danger. The opportunities as well as the pernicious consequences of that sort of leadership multiply, as the people extend direct participation into the more technical aspects of government. For this there is no remedy save a keener consciousness of personal responsibility on the part of the citizen, and a determination on his part to exercise the great privilege of the franchise with discriminating intelligence. Be that as it may, we are satisfied that it was not contemplated by the people, when the initiative and referendum became a part of the Constitution, that fraud and injustice could be perpetrated in its name by removing, through the referendum, the principal inducement that led to the enactment of a statute, with resulting perversion of the legislative purpose and consequent wrong and injustice against any class of citizens. If a section of a law be deemed objectionable, and if that portion cannot be removed without doing violence to the manifest purpose the legislature had in view, the remedy is simple and is found in the constitution itself. The entire act can be referred to the people and a suitable one initiated at the same or at another time. The means of giving effect to the popular will are so easily available that it is unnecessary

to sanction or encourage methods that are subversive of fundamental principles.

If, through the referendum, the very soul and purpose of a statute may be stricken from it, the most pernicious form of log rolling is invited. It would be a simple matter to load a legislative bill with riders and clauses in order to insure its passage, only to remove them later by the referendum. On the other hand, the interpretation we have put on the referendum clauses in the Constitution guards against an abuse of this reserved power, the possibilities of which are abundantly illustrated in the case at bar, without in any manner limiting its usefulness as a check or veto power against undesirable legislation by the people's representatives. The referendum may always, when deemed necessary, be supplemented by the initiative.

We conclude that if the result of striking from a law an item, a part, clause, or section, be to take from it the principal inducement that led to its passage in the legislature, and to leave a portion which, standing alone, is in reality a fundamental perversion of the purpose the lawmaking body intended to effect when the whole was enacted, the effect of such a referendum is to nullify the whole act as if the statute had been disapproved by the people in its entirety.

It is unnecessary to consider any of the constitutional questions raised. In passing, it may be said, in view of the great importance of the subject, that chapter 300 was not enacted for the purpose of reaching property which had *unlawfully* escaped taxation. It purports to authorize the collection of taxes, covering a number of years in the past, upon a class of property expressly exempted by a valid statute from publication, during the period in question. During the years covered by the act, the owners of the class of property, dealt with in the law, were not legally bound to pay a tax thereon, but, notwithstanding, the legislature of 1923 attempted, by the mere fiat of a statute, and without a hearing to the property owners, to create a demand against them which, if proper, would become a lien upon their property. It is not clear to us how this act could, had it not, as we have held, been nullified by the referendum of § 2, be sustained without doing violence to the most elementary principles. Upon its face it is not only a retroactive reversal of public policy upon the subject of taxation and exemption therefrom, but, in legal effect, it purports

53 N. Dak.—11.

to be a reversal of the decision of this court in State ex rel. Farmers State Bank v. Wallace, 48 N. D. 803, 187 N. W. 728. We leave this question, without decision or further discussion. The following authorities have a more or less direct bearing on the matter. Cooley, Const. Lim. 7th ed. 528ff; Hasbrouck v. Milwaukee, 13 Wis. 38, 80 Am. Dec. 718; Atchison & N. R. Co. v. Maquilkin, 12 Kan. 2d ed. 240 [301]; People ex rel. Butler v. Saginaw County, 26 Mich. 22; Hart v. Henderson, 17 Mich. 218; Kimball v. Rosendale, 42 Wis. 407, 24 Am. Dec. 421; Boardman v. Beckwith, 18 Iowa, 292; Iowa R. Land Co. v. Soper, 39 Iowa, 112; 26 R. C. L. 352; State ex rel. Miller v. Leech, 33 N. D. 513, 157 N. W. 492; First Nat. Bank v. Covington (C. C.) 103 Fed. 523; Lewis v. Pennsylvania R. Co. 220 Pa. 317, 18 L.R.A.(N.S.) 279, 69 Atl. 821, 13 Ann. Cas. 1142; People v. Holladay, 25 Cal. 301; Stockdale v. Atlantic Ins. Co. 20 Wall. 323, 22 L. ed. 348.

Judgment is affirmed.

BURKE, BIRDZELL, and NUESSLE, JJ., and BERRY, Dist. J., concur.

CHRISTIANSON, Ch. J., did not participate; BERRY, Dist. J., sitting in his place.